In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1190

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CLARENCE RICHARDSON, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98-CR-92--Rudolph T. Randa, Judge.

Argued September 24, 1999--Decided April 3, 2000

Before BAUER, RIPPLE, and DIANE P. WOOD, Circuit Judges.

Diane P. Wood, Circuit Judge.  Clarence Richardson, a convicted felon, was charged with unlawfully possessing a firearm, 18 U.S.C. sec. 922(g)(1), and possessing with intent to distribute cocaine, 21 U.S.C. sec. 841(a)(1). Because both the drugs and the gun were found during a warrantless search of Richardson's home, Richardson filed a pretrial motion to suppress the incriminating evidence, which the district court denied. After a bench trial, Richardson was convicted on both counts and received a sentence of 262 months in prison and a $500 fine. In his appeal, Richardson challenges both the suppression ruling and the sufficiency of the evidence to support his conviction. While we find no reversible error on either aspect of the case, the more serious issues arise in conjunction with the search, for the reasons we explain below. In the final analysis, however, we conclude that the judgment against Richardson must be affirmed.

I

On May 9, 1998, the Milwaukee police received a 911 call reporting that a 19-year-old African-American man named "Lucky" had raped and murdered a female. The caller said that the victim could be found in the basement at 1704 N. 37th Street, a residence the caller described as "a drug

house." The caller identified himself to the 911 operator as "Anthony Carter" and explained that he lived at the same address. The police had received a 911 call reporting a murder at the same address one week before Anthony Carter's call. That call turned out to be a false alarm: there was no murder victim.

Upon receiving the May 9 call, Milwaukee police went to 1704 N. 37th Street. The building was a duplex with upper and lower units; the lower unit was number 1704. Standing in front of the building was an African-American male holding a dog on a chain. The man identified himself to the police as Clarence Richardson and said he resided at 1704 N. 37th Street. The police officers explained to Richardson that they had received a 911 call reporting a murder. Richardson told the officers that this was the second time that week that this had happened.

Richardson went to take his dog inside the residence. The police officers instructed him to secure the dog on the porch, because they needed to search the residence. Although the police at one point contended otherwise, the magistrate judge found that Richardson did not consent to the search, and this finding was not challenged further. Before the officers entered the duplex, they directed anyone else inside to come out. That call prompted Shannon Purnell, another African-American male, to come outside. The officers then entered the lower unit of the duplex and conducted a search of the entire house. They did not have a warrant.

In the first floor unit the officers observed drugs (marijuana and crack cocaine) and drug-packaging materials on the dining room table. In the southern part of the basement, they saw more marijuana, two scales of the type commonly used to weigh drugs, and over 200 baggies. One officer spotted a Mossberg pistol grip shotgun on the bed in the front bedroom. Also on the bed were envelopes addressed to Clarence Richardson and prescription medications with his name and the 1704 N. 37th Street address on the labels. The officers did not find a female murder victim.

Purnell, who knew Richardson as "C," testified at Richardson's trial. He said that Richardson lived in the lower unit of the duplex and slept in the front bedroom. Purnell explained that he had been to Richardson's residence six or seven times and that he had seen Richardson smoking rock cocaine. Purnell also described seeing cocaine in Richardson's bedroom, but he did not know about the marijuana in the basement. Finally, Purnell testified that one week before the search, Richardson had told him he purchased a "pretty pump" (12 gauge shotgun) for between

$150 and $250.

A DEA Special Agent testified that the amount of cocaine, the packaging materials, and the scale were all consistent with drug dealing, and an ATF agent testified that an investigation of the shotgun's ownership revealed that one Lucky Allen was the owner. When the ATF agent had asked Allen about the gun, Allen told him that he owned the gun but that he no longer possessed it because it had been stolen.

Richardson filed a motion to suppress the evidence gathered during the warrantless search of his home. Magistrate Judge Goodstein recommended that Richardson's motion be denied, and Richardson filed objections to that report. In light of the objections, the district court decided in an order issued on August 31, 1998, to remand the motion to the magistrate judge for an evidentiary hearing. After the hearing, the magistrate judge issued a second recommendation to deny the motion to suppress, finding first that Richardson had a privacy interest in the residence and second that exigent circumstances justified the warrantless entry. Richardson again objected. At that juncture, in an order dated September 22, 1998, the district court adopted the magistrate judge's recommendation and denied Richardson's motion.

After the motion was denied, Richardson testified. He said he was the landlord and caretaker of 1704 N. 37th Street as well as several other properties in the area. During the two weeks before the search, he was staying at another Milwaukee address, but he continued to keep his clothes and medication and to receive mail at 1704 N. 37th Street. Sometime in April 1998, he permitted Lucky Allen to move into the 1704 N. 37th Street residence as a favor to some family members. After catching Allen with a shotgun, Richardson gave him two weeks' notice to vacate. Allen persuaded Richardson to let him stay by assuring him that he would not keep the gun. Richardson testified that he never saw drugs at 1704 N. 37th Street. The district court found that this added up to at least constructive possession of the gun and drugs, and hence criminal liability for Richardson under sec. 922(g)(1) and sec. 841(a)(1).

II

A. Denial of Richardson's Motion to Suppress

In reviewing a district court's denial of a motion to suppress, we review findings of historical fact and credibility determinations for clear error. United States v. Johnson, 170

F.3d 708, 713 (7th Cir. 1999). We give de novo review to mixed questions of law and fact such as determinations of probable cause or reasonable suspicion. Id., citing Ornelas v. United States, 517 U.S. 690, 699 (1996). Whether or not exigent circumstances were present is also a mixed question of law and fact, see United States v. Howard, 961 F.2d 1265, 1267 (7th Cir. 1992), and thus we also review that question de novo.

"A warrantless search or seizure is 'per se unreasonable unless the police can show that it falls in one of a carefully defined set of exceptions based on the presence of "exigent circumstances."'" United States v. Bennett, 908 F.2d 189, 192 (7th Cir. 1990), quoting Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1981). "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid. Similarly when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." Mincey v. Arizona, 437 U.S. 385, 392 (1978). Nevertheless, there is no general exception from the Fourth Amendment for searches of homicide scenes. Id. at 393-94.

This court has found that exigent circumstances justified a warrantless search where the police reasonably feared for the safety of someone inside the premises. United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995); United States v. Arch, 7 F.3d 1300, 1303-05 (7th Cir. 1993); United States v. Salava, 978 F.2d 320, 324-25 (7th Cir. 1992). However, a police officer's subjective belief that exigent circumstances exist is insufficient to make a warrantless search. Instead, as is normally the case for Fourth Amendment inquiries, the test is objective: "the government must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance." Arch, 7 F.3d at 1304.

We find this a very close case. The police officers' claim of exigent circumstances was based entirely on the 911 call, and the 911 operators had received a bogus call with almost exactly the same report only a week earlier. Pointing out the risk of fraud or, at the very least, unreliable and unproven information from 911 callers, Richardson argues that a 911 call cannot by itself justify a warrantless search or furnish a reasonable basis for an officer to believe that someone inside the residence needs

assistance. This line of argument goes too far, however; it invites us to adopt a presumption under which a 911 call could never support a finding of exigent circumstances. Many 911 calls are inspired by true emergencies that require an immediate response. Those factors have led both this court and others to conclude that 911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, the caller identified himself. See, e.g., United States v. Cunningham, 133 F.3d 1070, 1072-73 (8th Cir.), cert. denied 523 U.S. 1131 (1998); Salava, 978 F.2d at 321, 324-25. A 911 call is one of the most common--and universally recognized--means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help. This fits neatly with a central purpose of the exigent circumstances (or emergency) exception to the warrant requirement, namely, to ensure that the police or other government agents are able to assist persons in danger or otherwise in need of assistance. See United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992); Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."). The efficient and effective use of the emergency response networks requires that the police (and other rescue agents) be able to respond to such calls quickly and without unnecessary second-guessing. As then-Circuit Judge Burger stated in Wayne, "[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." 318 F.2d at 212.

Taking a more subjective tack, Richardson next argues that the police officers' behavior reveals that they did not believe that exigent circumstances existed. He points out that the police parked half a block away; they did not ask Richardson to unlock the basement door; they chose to enter through the main door to the unit rather than the basement's separate entrance; they searched the bedroom and other areas before proceeding to the basement (where the victim was reportedly located); and they did not ask for directions on the fastest route to the basement. Richardson also points out that the police did not summon an ambulance, even though they justified their warrantless entry on the possibility that the victim might still be alive. Coupled with the earlier crank call, these undisputed facts show in Richardson's opinion

that the police did not regard the situation as a bona fide emergency.

This line of argument cannot save the day for Richardson, however, to the extent that it is based on the subjective state of mind of the officers. If Richardson is inviting us to modify the existing test for exigent circumstances to add these subjective elements, we respectfully decline. Creating a subjective standard would be a double-edged sword: while it might protect some people from warrantless searches in those few instances where the police do not really believe an injured person is in need of assistance, it would also open up the possibility of warrantless searches anytime that police officers actually believed that an exigency existed--regardless of the objective basis of that belief. We adhere to our well-established rule that such a subjective belief cannot justify a warrantless entry. E.g., Arch, 7 F.3d at 1304. Using an objective standard ensures that there is some control on the reasonableness of police officers' behavior. This kind of external accountability is especially important when warrantless searches of homes are at stake.

Richardson also appears to suggest, however, that on the facts of this case it was objectively unreasonable for the police to search the house. The 911 caller did not indicate that a rape or murder was in progress; the caller said instead that the crime was complete. Faced with a report that there is a corpse in a house, it is hard to see why it is objectively reasonable to search in the hopes of finding a person who is still alive, but perhaps seriously wounded. Concern about whether exigent circumstances could be found on this kind of record was what prompted the district court to order an evidentiary hearing on precisely this issue. At that hearing, the police officers testified that in their experience, laypersons without medical knowledge are not in a position to determine whether a person is dead or alive. Someone who appeared to be dead might revive with immediate medical treatment. The officers stated, therefore, that they assume that anyone reported dead might be alive unless the report comes from qualified personnel such as a paramedic unit. It was on the basis of this assumption that they entered the house. Last, the officers testified that they did not personally know about the earlier bogus report.

Like the magistrate judge and the district court before us (whose conclusions we are reviewing de novo), we agree that it was objectively reasonable for the officers to conclude that the situation presented exigent circumstances on these particular facts. This is

not a case where the report indicated that the body had been languishing in the house for several days. Nor is it a case where other evidence might have made it clear that the victim was indeed dead, and not hovering on the verge of death. A modus operandi that is designed to save potential fatalities, where it is objectively reasonable to think that this is possible, is permissible. We note in this connection that Richardson did not introduce any evidence to rebut the officers' assertion that this was their practice, nor did he challenge their empirical assumption that lay witnesses were often wrong in their assumption that someone was beyond rescue.

Last, Richardson argues that to find exigent circumstances on these facts would lead to abuse of the 911 system: people with a grudge would have an incentive to make phony calls about their neighbors in order to allow the police to enter and search their neighbors' property without a warrant. Or perhaps competing drug dealers would report murders on one another's property so the premises would be searched and the competitor put out of business. The district court's first order on the motion echoes a similar concern: "The rule . . . would allow police a free and immediate warrantless entry into a dwelling upon every report of a murder, with no regard to its details." While we do not exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer, this is not that case. It may even be possible, in those rare cases where a false emergency call is made, that the "victim" (that is, the person whose house is searched) might have a remedy against the caller. Whether or not this is true, we have no evidence indicating that the 911 system is abused so often that it is objectively unreasonable for the police to rely on a call like the one Carter made here. We therefore agree that the district court correctly denied Richardson's suppression motion because the warrantless search fell within the exigent circumstances exception to the warrant requirement.

B.  Insufficiency of the Evidence

We review questions of sufficiency of the evidence "in the light most favorable to the government and ask whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." United States v. Rogers, 89 F.3d 1326, 1334 (7th Cir. 1996); see also United States v. Griffin, 150 F.3d 778, 784 (7th Cir. 1998).

The only element of the two crimes that

Richardson argues the government failed to prove was whether he had any dominion or control over either the gun or the drugs. Both offenses require "knowing possession" of either a gun or controlled substances. In addition to actual possession, possession can be constructive, and constructive possession can be established through circumstantial evidence. United States v. Gill, 58 F.3d 334, 336 (7th Cir. 1995). Constructive possession exists where the evidence demonstrates ownership, dominion, authority, or control. Id.; United States v. Hernandez, 13 F.3d 248, 252 (7th Cir. 1994). Constructive possession may be sole or joint. See United States v. Kitchen, 57 F.3d 516, 521 (7th Cir. 1995); United States v. Salazar, 983 F.2d 778, 782 (7th Cir. 1993). Establishing constructive possession requires that the government establish a nexus between the accused and the contraband, in order to distinguish the accused from a mere bystander. United States v. Windom, 19 F.3d 1190, 1199 (7th Cir. 1994).

The government's theory was that Richardson's constructive possession of the narcotics and the gun stemmed from his connection to the residence. It is disputed whether Richardson lived at 1704 N. 37th Street. (Purnell testified Richardson lived and slept there; Richardson testified he was living elsewhere and told the officers he was the "caretaker" of 1704 N. 37th Street.) But regardless of who is right, it is apparent that Richardson had a substantial connection to the house: in his bedroom were multiple medicine bottles labeled with his name as well as his clothes; he received his mail at 1704 N. 37th Street; and he admitted that he was the caretaker and landlord of the address. This is enough to prove that Richardson had control over the property and to establish a nexus between the contraband and Richardson. Compare Kitchen, 57 F.3d at 519-21 (establishing constructive possession over firearms where papers and notes bearing the defendant's name and a bracelet with the defendant's nickname were found in the same room of defendant's girlfriend's home as the guns), with Windom, 19 F.3d at 1200-01 (finding constructive possession not established where the only connection between the defendant and the contraband was their simultaneous presence in the same house).

Richardson does not contest the legal force of these points. Instead, he alleges that Purnell perjured himself and that without Purnell's (perjured) testimony, there would be insufficient evidence to link Richardson to the house. Richardson's argument, however, cannot carry the day. We accord great deference to the trier of fact regarding credibility determinations.

Nothing in the record suggests that Richardson's testimony is more reliable than Purnell's. Because the testimony could have supported either conclusion, the district court could not have clearly erred when it chose to believe Purnell rather than Richardson. See United States v. Yusuff, 96 F.3d 982, 989 (7th Cir. 1996). In addition, even without Purnell's testimony, there was ample evidence linking Richardson to the drugs and the gun. Richardson was the caretaker of the residence and exercised control over the property. On the evening of the search, Richardson was present. The officers found the gun in Richardson's bedroom along with his personal items. Without any help from Purnell, this evidence establishes Richardson's constructive possession over the shotgun. The same can be said for the drugs: they were in plain view in the main rooms of the house.

III

For these reasons, we therefore AFFIRM the judgment of the district court.