In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1487

KAREN FITZGERALD,

*Plaintiff-Appellant,*

*v.*

OFFICER M. SANTORO, OFFICER B. CRAM,
PARAMEDIC D. ASHCROFT, and UNKNOWN OFFICERS AND
PARAMEDICS OF THE VILLAGE OF SCHAUMBURG,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 388—**Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 19, 2012—DECIDED FEBRUARY 7, 2013

Before BAUER, KANNE, and WOOD, *Circuit Judges*.

KANNE, *Circuit Judge*. On February 5, 2010, Karen Fitz-
gerald had a few drinks to help her unwind from a stress-
ful day, mistakenly phoned a local police dispatch
line, and, due to what the officer interpreted as suicidal
statements, was eventually taken to a local hospital
against her will. The events of the evening left her with a

severely broken wrist that required multiple surgeries to repair. She brought this lawsuit against various police officers and paramedics who were with her that night, in an attempt to recoup some measure of damages for what she feels were their unconstitutionally unreasonable actions. The district court concluded otherwise and granted summary judgment to the defendants. Because we find that the defendants were indeed entitled to judgment as a matter of law, we affirm.

## I. BACKGROUND

February 5, 2010 was an exhausting day for Karen Fitzgerald, and it came in the midst of what seems to have been a troublesome period for her in general. She had not eaten since the previous day and had not slept in three days. (R. at 121.) Then, on top of it all, Fitzgerald's telephone and internet service went out. AT&T was called, and a repairman dispatched. In a display of customer service that seems admirable in hindsight, but was no doubt tiresome at the time, the repairman stayed in Fitzgerald's condominium until after midnight to resolve the problem. After the repairman finally left, Fitzgerald tried to relax by drinking some wine. Feeling "down," (Appellant's Br. at 4), and "very aggravated by a number of things," (R. at 120), Fitzgerald attempted to call a help line at the Northwest Community Hospital that "allows you to speak to somebody for 45 minutes," (R. at 120.)

Rather than calling the help line, however, Fitzgerald called the non-emergency number for the Palatine, Illinois

Police Department. And, instead of reaching somebody "to talk about [the] silly things that [were] aggravating" her, (R. at 120-21), Fitzgerald found herself talking to the Palatine P.D.'s late-night desk officer. She proceeded to talk to the desk officer anyway. Though Fitzgerald denied suicidal thought or intention, the desk officer contacted the Schaumburg Police Department (in whose jurisdiction Fitzgerald lived) and described a "very depressed," possibly suicidal, intoxicated female caller. (Dispatch Radio Transmission audio recording.) Officers Bruce Cram and Marc Santoro, and Paramedics David Ashcroft and Tom Blair,[1] were swiftly dispatched to Fitzgerald's condominium. During the dispatch, the Palatine officer—who was still on the phone with Fitzgerald—stayed on the line with Schaumburg as well. The Schaumburg dispatcher informed the officers that Fitzgerald had recently miscarried and that Fitzgerald had made suicidal statements to the Palatine desk officer. As the officers approached the building, Fitzgerald abruptly hung up on the Palatine desk officer. This information was quickly relayed to the officers.

The specifics of the officers' entry are disputed, but, at this stage of the proceedings, we must presume that Fitzgerald's description of a warrantless, forced entry is accurate. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 993 (7th Cir. 2011). Upon entering the apartment, the officers and paramedics encountered a Fitzgerald they described as unsteady on her feet and slurring her

---

[1]  Blair is not a party to this case.

words. Seeing a used wine glass nearby, they concluded that Fitzgerald was intoxicated.[2] Over the course of the next thirty minutes, the officers and paramedics spoke with Fitzgerald on her couch. She denied wanting to harm herself, but admitted to being upset and told them that she had been taking anti-depressants. At some point during this discussion, Officer Santoro left the condo to call the dispatcher back and confirm what Fitzgerald had said to the Palatine desk officer. The dispatcher confirmed that Fitzgerald had made suicidal statements. At this point, the officers and paramedics decided that Fitzgerald was a potential harm to herself. They, along with Fitzgerald, unsuccessfully attempted to contact several of Fitzgerald's friends who could have stayed with her. The decision was then made to take Fitzgerald to the hospital.

Fitzgerald resisted this decision and made it clear to the officers that she would not go to the hospital voluntarily. As the officers tried to take her to the gurney, she "scream[ed] at the top of [her] lungs" and physically resisted. (R. at 131.) Fitzgerald described being grabbed "forcefully" by three people and dragged from her home while she tried to pull away from them and "free [her]self." (R. at 130.) Officer Cram used a technique called an "arm bar" and Officer Santoro used a "wrist lock"

---

[2] Fitzgerald disputes that she actually *was* intoxicated. For reasons we explain later, we do not credit her argument. Nevertheless, it is undisputed that the officers and paramedics *thought* she was intoxicated and that they described various indicia that reasonably led them to this conclusion.

in attempts to de-escalate the situation and move Fitz-gerald to the gurney.[3] Eventually, the officers and para-medics lifted Fitzgerald onto the stretcher; once there, they handcuffed her right hand to the stretcher. Fitz-gerald complained that the cuff was too tight, and Officer Santoro loosened it. They then wheeled her to the ambulance.

Inside the ambulance, Fitzgerald's resistance contin-ued. She attempted to wrest her hand out of the hand-cuff and to get out of the safety straps. She apparently had some measure of success. Officer Cram attempted to secure her again by using a wrist lock on her right wrist. Fitzgerald also remembers another hand grabbing her right arm further up. At that point, Fitzgerald used her left hand to attempt to free her right arm from Officer Cram's hold.[4] What followed has been variously

---

[3] Appellees describe an "arm bar" as a "control technique where the officer takes the subject's wrist in one hand and places the other hand above the subject's elbow. The arm is then rotated slightly forward and pulled slightly back to prevent the subject from bending the elbow and shoulder joints." (Appellees' Br. at 6.) That description is not contested.

Appellees describe a "wrist lock" as a "control technique where the officer holds onto the subject's wrist, bending the wrist downwards towards the subject's palm, and holds it in a 90-degree angle with the subject's arm." (Appellee's Br. at 6.) That description is also not contested.

[4] In her deposition, Fitzgerald described this as "probably" what happened, though she equivocated on the sequence of

(continued...)

described by the individuals in the ambulance as a "snap-ping sound," (R. at 250) or "two crunches," (R. at 141), coming from Fitzgerald's right wrist. Her active re-sistence ceased, and Fitzgerald was given ice for her wrist. Once at the hospital, Fitzgerald was diagnosed with fractures of both her right radius and ulna. Multiple surgeries, as well as various rods and pins, were required to repair the injury.

Fitzgerald presented three potential wrongs to the district court for which she argued she deserved to be compensated: (1) the defendants' warrantless entry into her apartment; (2) her unreasonable seizure at the defendants' hands; and (3) the defendants' use of exces-sive force in effectuating that seizure. This third claim can be separated further into the force used in her building and the force used in the ambulance. Fitzgerald couched her claims under the Fourth Amendment and 42 U.S.C. § 1983. The district court granted summary judgment for the defendants, and Fitzgerald timely filed this appeal. We address her claims in order below.

## II. ANALYSIS

"We review a district court's grant of summary judgment *de novo*, drawing all reasonable inferences and viewing

---

[4] (...continued)
events (or various events' existence) throughout. (Dep. at 161.) Based partially on the defendants' corroborating testimony on this point, we credit Fitzgerald's description.

all facts in favor of the non-moving party." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772 (7th Cir. 2012). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (internal brackets and quotation marks omitted). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, to survive summary judgment, the non-moving party must establish some genuine issue for trial "such that a reasonable jury could return a verdict" in her favor. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## A. Warrantless Entry

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment*." Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal citation and quotation marks omitted). Thus, generally speaking, warrantless searches and seizures "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically estab-

lished and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *accord United States v. Henderson*, 536 F.3d 776, 779 (7th Cir. 2008). One of these "well-delineated exceptions" is the existence of exigent circumstances; "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978); *United States v. Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008). Reasonable fear for the safety of a person inside a premises is one such exigent circumstance. *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000); *United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993). The watchword in the preceding sentence is "reasonable." "A police officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless search[;]. . . [i]nstead[,]. . . this Court conducts an objective review. . . [and] we ask whether a reasonable officer had a reasonable belief that there was a compelling need to act and no time to obtain a warrant." *Bogan v. City of Chicago*, 644 F.3d 563, 571 (7th Cir. 2011) (internal citation, brackets, and quotation marks omitted). Importantly, the reasonable belief must be based on actual knowledge the officers had at the time of the entry, rather than on knowledge acquired after the fact. *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003).

Here, we have reliable evidence showing exactly what the defendants knew at the time of the warrantless entry: an audio copy of the dispatch radio transmission from that evening. The initial dispatch call to Officers Santoro and Cram reported a "possibly suicidal subject." (Dispatch Radio Transmission audio

recording at 00:06.) Subsequent transmissions by the dispatch officer removed any equivocation; they described Fitzgerald as suicidal and reported that she "made suicidal statements to the desk officer" of the Palatine P.D. *(Id.* at 00:36.) The officer further reported that "she did sound intoxicated or under the influence of drugs," *(id.* at 00:48), and that she was "very difficult to understand," *(id.* at 03:31). The Schaumburg dispatcher told Officers Santoro and Cram that the Palatine desk officer "heard the word 'suicide' several times" and when they asked her if she was thinking about suicide she said she'd been very depressed. *(Id.* at 03:31.) The dispatcher then advised the officers that Fitzgerald had just hung up on the Palatine desk. *(Id.* at 03:51.)

"The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.*" Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see also United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007) ("[T]he police need not stand by when violence erupts and wait for a blow to render a victim unconscious, but rather may step in to prevent serious injury and restore order."); *Richardson*, 208 F.3d at 629 ("The Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid.") (internal brackets omitted). "[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence . . . has just occurred or is about to (or soon will) occur." *Georgia v. Randolph*, 547 U.S. 103, 118 (2006). We think that statement is no less true when the

violence is directed at one's self and the tort is of the constitutional variety.

The key question in a warrantless entry case is whether "the circumstances as they appeared *at the moment of entry* would lead a reasonable, experienced law enforcement officer to believe that someone inside the house . . . required immediate assistance*." Arch*, 7 F.3d at 1304 (emphasis added). Fitzgerald is correct, as we have noted above, that the officers were required to have an objectively reasonable basis for their belief that exigent circumstances existed. But she is incorrect in arguing that the fact "[s]he accidentally called the non-emergency number of the Palatine Police station" or the fact that she did not actually threaten suicide to the Palatine officer should be part of that calculation. (Appellant's Br. at 17.) It is undisputed that the officers did not know these facts at the moment of entry. Fitzgerald further contends that "the absence of evidence of [her] suicidal intent or ideation in [the Schaumburg officers'] presence" should be considered when analyzing the reasonableness of the warrantless entry. (*Id*.) Again, these observations were clearly not available to the officers *at the moment of entry*. Fitzgerald also contends that "[e]ven if exigent circumstances existed for the initial entry, the exigency dissipated" after the officers were inside the apartment. (*Id*.) While that might be true, it is irrelevant for our warrantless *entry* analysis. *See, e.g., Richardson*, 208 F.3d at 629.

Here, the officers had an objectively reasonable belief that they needed to enter without a warrant in order to

prevent serious injury. They had been told that the woman inside had called a police station, that she sounded intoxicated, and that she had threatened suicide. The woman had abruptly hung up the phone just as they were approaching the building. None of these facts are disputed, and, from the officers' perspective, they paint an objectively reasonable picture of an exigent circumstance. This case fits snugly within our precedents holding that police officers and other emergency personnel must be "able to assist persons in danger or otherwise in need of assistance." *Richardson*, 208 F.3d at 630. "[W]hen police are acting in a swiftly developing situation . . . a court must not indulge in unrealistic second-guessing." *Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005) (internal quotation marks omitted). We apply that maxim again today. The district court was correct in holding that the defendants were entitled to summary judgment on the warrantless entry claim.

### B. Unreasonable Seizure

As with entry, seizure—even a civil seizure, as we have here—is a question governed by the Fourth Amendment. *Soldal v. Cook Cnty.*, 506 U.S. 56, 69 (1992); *Perry v. Sheahan*, 222 F.3d 309, 316 (7th Cir. 2000). Specifically, seizures made to effectuate an involuntary mental health commitment are analyzed under the Fourth Amendment's "probable cause" standard. *Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992); *accord McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 544 (1st Cir. 1996). Probable cause exists "only if there are reasonable

grounds for believing that the person seized is subject to seizure under the governing legal standard" *Villanova*, 972 F.2d at 795. In Illinois, the governing legal standard is 405 ILCS 5/3-606:

> "A peace officer may take a person into custody and transport him to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission and in need of immediate hospitalization to protect such person or others from physical harm."

Fitzgerald does not challenge that standard here. "The probable cause inquiry is an *objective* one; the subjective motivations of the officer do not invalidate a [Fourth Amendment action] otherwise supported by probable cause." *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010). Thus, the question before us is whether the officers had objectively reasonable grounds for believing that Fitzgerald required immediate hospitalization to protect her from self-harm. Even reviewing the record in the light most favorable to Fitzgerald, we find that they did.

Again, Fitzgerald seems to ask us to ignore important features of the objective reasonableness standard. She argues at length that whether the "defendants tried to take her into custody because of animus—and not based on any belief that Ms. Fitzgerald posed an immediate danger to herself or others," was an important factual question that should have been decided by the jury. (Appellant's Reply Br. at 5.) This misconstrues the objective standard and our precedent on the subject. Rather

than trying to divine whether or not the officers acted with "animus," we are tasked with reviewing "the facts as they would have appeared to a reasonable person *in the position of the arresting officer*," *Carmichael*, 605 F.3d at 457. It is "clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Thus, the officers' alleged motivations here are irrelevant; neither we, nor a reasonable jury, should properly consider those motivations.

As with the issue of entry, we must examine the uncontested facts as the officers knew them. They had been told that Fitzgerald called a local police station and made suicidal statements, a description that was confirmed by the dispatch officer while the officers spoke with Fitzgerald. They observed that Fitzgerald was unsteady on her feet and possibly intoxicated. She told the officers that she was taking anti-depressants and was going through a difficult period. Weighing in the opposite direction, the officers heard Fitzgerald deny that she was, in fact, suicidal. And she was obviously opposed to going to a hospital voluntarily, despite her apparent call for help. Even considering these last two facts, when viewed in light of the other information, we do not think it was unreasonable for the officers to conclude that Fitzgerald required immediate hospitalization to protect her from self-harm. We thus find Fitzgerald's claim without merit.

Fitzgerald also contends that, contrary to the officers' descriptions, she was not intoxicated. (Appellant's

Reply Br. at 3.) She argues that—as an important part of the totality of the circumstances here—this factual dispute should have been sent to a jury. (*Id.* at 3-4.) We disagree. While at the hospital, it is documented and undisputed that Fitzgerald had a blood alcohol level of .298. (R. at 278.) As a point of comparison, the legal blood alcohol limit to drive in the state of Illinois is .08. *See* 625 ILCS 5/11-501. Our task on an appeal of summary judgment is to draw all *reasonable* inferences in favor of the non-moving party. *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011). The inference Fitzgerald asks us to draw in this case—that she was not intoxicated despite a blood alcohol level over three-and-a-half times the state's legal driving limit—strikes us as unreasonable. At best, Fitzgerald raises "some metaphysical doubt as to [a] material fact[ ]." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008). That is not enough. *Id.*

## C. *Excessive Force*

Fitzgerald also claims that the seizure, even if supported by probable cause, was accomplished through the use of excessive force. If true, this too would be a violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009). The appropriate question in such a case is whether the officers' actions are objectively reasonable in light of the totality of the circumstances. *Graham*, 490 U.S. at 396-97. "The 'reasonableness' of a particular use of force must be judged from the perspec-

tive of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the [seizure], the officer uses greater force than was reasonably necessary to effectuate the [seizure]." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). Further, the "[o]bjective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide." *Id.* at 520. Here again, we cannot conclude that the officers' conduct, either in the apartment or in the ambulance, was objectively unreasonable in light of the totality of the circumstances.

*1. Excessive force in the apartment building*

Based on Fitzgerald's descriptions of the events in the apartment, the officers, in order to take her from her home to the hospital, "grabbed her by the arms," (R. at 128), in some manner and "forcibly" put her onto the gurney, (R. at 131). While they did this, it is uncontested that she resisted. Fitzgerald variously described her resistance as "pull[ing] [her] arms away," (R. at 130), "screaming at the top of [her] lungs," (R. at 131), and "trying to fight them," (*id.*). The officers describe the techniques they used to secure her as the "arm bar" and "wrist lock" positions. What those techniques entailed was not contested. Once Fitzgerald was on the gurney, Officer Santoro used a handcuff on her right wrist. When she complained that it was too tight, he loosened it. Fitzgerald continued to resist, and the gurney's safety

straps were placed around her. The officers proceeded to wheel her from the apartment to the waiting ambulance. Fitzgerald contends that the officers' use of force during this period was unconstitutionally unreasonable. We disagree.

Keeping in mind the same information that gave the officers probable cause for the seizure in the first place, the officers were now additionally confronted with an actively resisting individual. We have repeatedly upheld officers' use of force in the face of suspects resisting arrest. *See, e.g., Padula v. Leimbach*, 656 F.3d 595, 603-04 (7th Cir. 2011) (affirming summary judgment for defendant police officers who used their batons to subdue an individual they believed to be resisting); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593-94 (7th Cir. 1997); *see also Graham*, 490 U.S. at 396 (including as a consideration in excessive force analysis "whether [a suspect] is actively resisting arrest or attempting to evade arrest by flight"). We acknowledge that this situation is somewhat different from a standard arrest case because Fitzgerald was not a criminal suspect, and she was not subject to arrest, but rather to civil seizure for self-protection. Recognizing that, however, we must also recognize that Officers Santoro and Cram used comparably less force than in some arrests we have upheld. *See, e.g., Padula*, 656 F.3d at 603-04; *Estate of Phillips*, 123 F.3d at 593-94. The defendants here used minimally forceful techniques designed to subdue non-compliant subjects and prevent escalation. They did not strike or beat Fitzgerald; they did not attempt to completely disable her. The officers held her arm and wrist in a firm manner meant to induce cooperation. We think that those tech-

niques were objectively reasonable given the circumstances here.[5]

## 2. *Excessive force in the ambulance*

Fitzgerald additionally contends that the defendants used excessive force once inside the ambulance. For reasons similar to those discussed above, however, we are not convinced.

Fitzgerald continued her active resistance while she was on the gurney inside the ambulance. Specifically, she attempted to free her right hand from the handcuff and undo the safety straps that kept her in place. Officer Cram responded by again employing the "wrist lock" technique on Fitzgerald. In a further attempt to resist, Fitzgerald used her left hand to attempt to free herself from Officer Cram's hold. At this point, Fitzgerald's right wrist broke. Her argument is that Officer Cram's hold constituted unreasonable force.

---

[5] The defendants cite multiple district court opinions for the proposition that these and similar techniques are always "*de minimis*" uses of force and can never be unconstitutionally excessive, apparently to encourage us to follow suit. (Appellees' Br. at 21-22.) Although the techniques were reasonable here, we are not prepared to state that they will always be reasonable, under all circumstances. Instead, we once again affirm that the excessive force inquiry must take into account the "totality of the circumstances," *Phillips*, 678 F.3d at 519, as experienced by a "reasonable officer on the scene," *Graham*, 490 U.S. at 396.

As a preliminary matter, Fitzgerald points to her broken wrist as evidence of Officer Cram's excessive force. We note, however, that based on her own deposition testimony, the last act prior to Fitzgerald's wrist snapping was her grabbing her own right arm with her left hand and trying to wrench it from Officer Cram's grip. In other words, the broken wrist seems to be better evidence of *Fitzgerald's* use of force than Officer Cram's. To be sure, Officer Cram still used force in the ambulance, and we analyze that force for excessiveness below.

To the totality of the circumstances already described and analyzed, we add the consideration that Officer Cram now faced an actively resisting Fitzgerald in the back of a vehicle presumably filled with medical equipment. Fitzgerald testified that she wanted to "get the heck out of there," (R. at 140), and, by her own admission, she took several steps to achieve that result. Such an outcome would have been a further risk to both her safety and the safety of those around her. Again, Officer Cram did not beat or strike or attempt to completely disable Fitzgerald; he attempted to subdue her so that she remained safely restrained for the duration of her transport. We do not think that it was unreasonably excessive for Officer Cram to use some force to safely secure Fitzgerald in this instance, and we do not think that a reasonable jury could have found otherwise.

As a final note, Fitzgerald contends that she felt multiple sets of hands on her while in both the apartment and the ambulance, and that this inconsistency with the officers' statements creates a dispute of material

fact that must be resolved at trial. The defendants respond that Fitzgerald failed to properly put these arguments before the district court or otherwise adequately contradict their statement of facts in such a manner as to preserve the issue. But, setting defendants' procedural argument aside, we find Fitzgerald's contentions lacking. The overall amount of force in both the apartment and the ambulance is essentially uncontradicted. Our analysis would not be different simply because that force was applied by some other number of hands.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.