In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 24-2655 and 24-3113

ANTRON CANNON,

*Plaintiff-Appellant,*

*v.*

WALKER FILIP, *et al.*,

*Defendants-Appellees.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-03289 — **Matthew F. Kennelly**, *Judge.*

———————

ARGUED APRIL 15, 2025 — DECIDED DECEMBER 31, 2025

———————

Before EASTERBROOK, KOLAR, and MALDONADO, *Circuit Judges*.

MALDONADO, *Circuit Judge*. Antron Cannon sued the City of Aurora, Illinois, and several Aurora police officers alleging that the officers violated his Fourth Amendment rights when they entered his home without a warrant and arrested him for domestic battery in June 2021. The district court entered summary judgment for the officers, finding that exigent

circumstances justified their entry and that probable cause supported the arrest. It then dismissed Cannon's suit and ordered him to pay Defendants' costs, rejecting his claim that his alleged indigency should excuse him from payment.

Cannon now appeals the district court's summary judgment order and its order taxing costs. We affirm both orders. We hold that the officers' warrantless entry into Cannon's home was reasonable under the exigent circumstances presented, and that probable cause supported Cannon's arrest. We also find that the district court did not abuse its discretion in awarding costs.

## BACKGROUND

### I. Facts

The following facts are undisputed, except where otherwise noted, and are presented in the light most favorable to Cannon, the party opposing summary judgment. *See Milligan-Grimstad v. Stanley*, 877 F.3d 705, 708 (7th Cir. 2017).

On the evening of June 27, 2021, Cannon was at his home in Aurora, Illinois with a female companion, Sarah Taylor, and his cousin, Jonathan. Cannon and Taylor were in a bedroom having sex when Jonathan attempted to enter the room. According to Cannon, he argued with Jonathan over his attempts to enter and kicked Jonathan out of the house. Jonathan, on the other hand, called his aunt, Aunt Ray, and told her that Cannon was arguing with and hitting a woman in his bedroom.

Aunt Ray, who lives in nearby Oswego, Illinois, then placed a 911 call to Aurora police around 9:40 p.m. Aunt Ray gave her name and told the dispatcher that her nephew had just called to tell her that her other nephew, Cannon, was

locked in a bedroom in his home and was beating up a woman. Aunt Ray stated that Jonathan had told her that Cannon was drunk, violent, and had "lost his mind."

Aurora police officers Walker Fillip and Christopher Grandchamp were the first to respond to the 911 dispatch call, which was reported to them as a domestic violence incident. In particular, dispatchers informed officers—via radio and real-time dispatch notes in the officers' patrol vehicles—that a family member staying at Cannon's home had reported (through his aunt) that Cannon was beating a woman, and that he had "lost his mind."

Cannon, for his part, vigorously denies physically harming Taylor that night. He asserts that the two were having consensual sex when Jonathan attempted to enter the bedroom.

In any event, Officers Filip and Grandchamp arrived at Cannon's home around 9:45 p.m. The parties present different versions about what happened after officers arrived and approached the house. Filip and Grandchamp testified that they heard screaming and yelling coming from inside the home, and Grandchamp further testified that a neighbor on a nearby porch told the officers that he had not seen anybody leave the home. The officers further contend that they knocked on the door for several minutes, and that eventually Cannon answered and yelled at them to leave and get a warrant before he slammed the door and could be heard barricading it. Cannon, however, denies that there was any screaming inside the home and states that he is unsure what the officers think they heard, because he and Taylor were engaged in consensual sex at the time. Cannon further denies that he answered the door and yelled at the officers or that he barricaded the door. While

he and Taylor testified that they heard knocking, they maintain that they did not stop having sex to answer.

In the meantime, while Filip and Grandchamp were at Cannon's door, the 911 dispatcher called Aunt Ray back to tell her that officers had arrived but could not get anybody to answer. After some discussion, the dispatcher requested Jonathan's number, which Aunt Ray provided. The dispatcher then called Jonathan; he confirmed the information that Aunt Ray had reported but he stated that he did not want to get involved further. During the conversation, Jonathan advised the dispatcher that a side door near the garage was unlocked.

Back at the scene, Officers Filip and Grandchamp testified that they conferred and made the decision that they needed to enter the home because they believed there was the potential for somebody inside to be hurt, seriously injured, or killed. Accordingly, Officer Grandchamp called Sergeant Joseph Howe, the shift manager, and informed him that the officers believed there was exigency and planned to enter the home.

At around 10:00 p.m., Officers Grandchamp, Driscoll and Pineda (and at least one more non-party officer) entered Cannon's home through the unlocked side door, while Officer Filip remained at the front. When the officers entered, they found Cannon and Taylor naked in the living room. The officers quickly handcuffed Cannon, had him sit on the stairs in the living room, and gave him a shirt and towel to cover his midsection. The officers separated Taylor from Cannon by moving her to the kitchen.

Soon after, Officer Filip entered the home and briefly interviewed Taylor. Taylor told him that she was having

consensual sex with Cannon when she picked up her phone to see what her friends were doing, at which point Cannon "went crazy" and proceeded to choke, bite, and hit her. Cannon told officers that he was doing nothing illegal, and that he and Taylor were having "rough" consensual sex.

Approximately 15 minutes after the first officers entered the house and detained Cannon, Officer Lisa Perez[1] arrived at the house after being dispatched to the scene. Officer Perez took over the interview from Officer Filip and invited Taylor outside to her patrol car to give a recorded statement. In the recorded interview, Taylor told Perez that she had just met Cannon the prior week on Facebook, and she claimed not to even know his real name. Taylor stated that the two were hanging out but when she tried to leave, Cannon attacked her, choked her, hit her, and told her he would not let her go. She went on to say that Cannon's cousin was there telling Cannon to let her go, but that Cannon would not stop. Taylor further stated that she thought she lost consciousness at one point and that Cannon was trying to kill her. During the interview, Taylor consented to officers photographing her injuries, which included bruising, welts and scratches on different parts of her body.

After Taylor was interviewed and photographed, the officers arrested Cannon for domestic battery. He was ultimately charged with two counts of misdemeanor domestic battery which causes bodily harm, but the charges were later dropped without any further proceedings.

---

[1] Officer Perez's last name was Rodriguez at the time, which is how she is named in the complaint, but we refer to her by her current surname.

## II. Procedural History

Cannon initiated this lawsuit in June 2022 against six individual Aurora officers (Fillip, Grandchamp, Driscoll, Pineda, Perez, and Sgt. Howe) and the City of Aurora. Cannon's operative complaint asserts claims for unlawful search, false arrest, and indemnification against the City. After discovery, the Defendants moved for summary judgment on all of Cannon's claims, which the district court granted. In short, the court agreed that exigent circumstances justified the officers' warrantless entry and that the officers had probable cause to believe Cannon committed a battery. The court also dismissed the indemnification claim against the City as it was dependent on the merits of the other claims.

After the grant of summary judgment, Defendants filed a bill of costs in the amount of $4,071.33 (largely for deposition costs). Cannon objected, but did not challenge any particular item of cost. Instead, he argued that the court should decline to award costs because he was indigent. Cannon also argued that he should be excused from liability because the issues were close and he brought the lawsuit to vindicate his civil rights in good faith.

The district court overruled Cannon's objections and awarded costs. The court acknowledged that it could deny costs if the losing party was indigent, but that this required a showing "not just of whether the losing party can pay costs now, but whether he will be able to pay costs in the future." R. 94 (citing *Rivera v. City of Chicago*, 469 F.3d 631, 635 (7th Cir. 2006)). The court found that, although Cannon had established the first proposition (current indigence), he had not established the latter "as the record contains no information that would indicate that plaintiff is likely to remain indigent into

the foreseeable future." The court further rejected Cannon's argument that it should consider his good faith in bringing the lawsuit. *Id.*

Cannon now appeals the entry of summary judgment and the award of costs.

## DISCUSSION

We review de novo the district court's summary judgment ruling and draw all reasonable factual inferences in Cannon's favor. *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022). We review the district court's cost award for abuse of discretion. *Yates v. City of Chicago, Illinois*, 58 F.4th 907, 910 (7th Cir. 2023).

## I. Warrantless Entry into Cannon's Home

The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "It is a basic principle of Fourth Amendment law … that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). But this presumption may be overcome in some cases, "because [t]he ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotation marks omitted). "Accordingly, the warrant requirement is subject to certain reasonable exceptions." *Id.*

One well-recognized exception is when exigent circumstances "make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 460 (citations omitted). The Supreme Court has recognized several types of exigencies that may justify warrantless searches, including, relevant here, the

"emergency aid exception." *Brigham City*, 547 U.S. at 403. Under the emergency aid exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *King*, 563 U.S. at 460; *see Sutterfield v. City of Milwaukee*, 751 F.3d 542, 558 (7th Cir. 2014) ("[T]his doctrine recognizes that police play a service and protective role in addition to a law enforcement role … police officers may sometimes need to enter a dwelling in order to render aid to an occupant whom they believe to be in distress and in immediate need of their assistance.").

The test for the emergency aid exception, like other Fourth Amendment inquiries, is objective: "the question is whether the police, given the facts confronting them, reasonably believed that it was necessary to enter a home in order to render assistance or prevent harm to persons or property within." *Sutterfield*, 751 F.3d at 558; *United States v. Maxwell*, 85 F.4th 1243, 1246 (7th Cir. 2023) ("police need an 'objectively reasonable basis for believing' [] that 'someone is in need of aid and there is a compelling need to act.'") (citations omitted). "The reasonable belief must be based on actual knowledge the officers had at the time of the entry, rather than on knowledge acquired after the fact." *Fitzgerald v. Santoro*, 707 F.3d 725, 730-31 (7th Cir. 2013) (citing *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003)).

Here we conclude that, based on the undisputed facts, the officers had an objectively reasonable basis to believe that someone in Cannon's home needed immediate aid and that there was a compelling need to enter without a warrant. The officers were informed, via radio and dispatch notes, that they were responding to a 911 call about a domestic violence

incident and that Cannon was in the home, had "lost his mind," and was beating up a woman. This information, which the officers knew had been relayed to the 911 caller from somebody who had been in the home, would support a reasonable belief that a person was inside and needed immediate aid. We have previously held that information given to officers from emergency 911 calls alone may sometimes be enough to justify a warrantless entry. *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) ("[m]any 911 calls are inspired by true emergencies that require an immediate response … 911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where … the caller identified himself.").

Reports of domestic violence in particular add to the exigency given the volatile and combustible nature of such incidents. *See generally Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) ("Courts have recognized the combustible nature of domestic disputes and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger."); *see also Georgia v. Randolph*, 547 U.S. 103, 118 (2006) (observing that there is "[n]o question … about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists[.]"). The 911 call reporting domestic violence, as relayed to the officers through the dispatch notes, thus provided an objective and compelling basis to believe someone needed protection.

Whether the 911 call alone justified the officers' entry is not a question we need decide here because additional facts pointed to an immediate need for the officers to act. For one, the officers heard loud noises coming from within Cannon's home after they arrived. Cannon denies the officer's claim that there was any screaming or yelling, and he suggests that any noise the officers might have heard was attributable to consensual sexual activity. But even if we accept that the noises the officers heard were not domestic violence, there is nothing to suggest that a reasonable officer in the Defendants' position would have been able to identify the source of the loud sounds. At the very least, there is no indication the noise, whatever its origin, should have caused officers to second-guess what was relayed to them from the 911 call, which suggested an active and ongoing domestic battery. The officers were not required to wait and deliberate the origin of the noises they heard. *See Richardson*, 208 F.3d at 630 ("[T]he business of policemen [] is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.") (internal quotation marks omitted). Further, a neighbor had advised the officers that nobody had left the home, suggesting that the domestic violence incident that had been reported just minutes earlier was still ongoing.

Taken together then, the 911 call, the report from the neighbor, and the noise provided the officers with an objectively reasonable basis to believe that there was an immediate need to enter the home to provide aid. The officers' entry was therefore reasonable notwithstanding the lack of a warrant. *See Jenkins*, 329 F.3d at 582 (finding that exigent circumstances

justified officer's warrantless entry, where officer was responding to a 911 call about an assault in progress, found the home's door open, and heard a noise from inside).

Cannon's arguments do not persuade us otherwise. He maintains that he and Taylor were engaged in consensual sex, that he never attacked her, and that Jonathan fabricated the story he told Aunt Ray and the 911 dispatcher. According to Cannon, the 911 call was not a true emergency report but an act of "swatting" by his disgruntled cousin upset about being kicked out of the home. In his view, his and Taylor's later deposition testimony about that evening creates at least a dispute of fact as to whether the officers had an objectively reasonable belief that someone was in imminent danger to justify their warrantless entry.

Setting aside that Cannon's "swatting" claim is entirely unsupported by the record, the above facts are immaterial to the exigent circumstances analysis. "The key question in a warrantless entry case is whether 'the circumstances as they appeared *at the moment of entry* would lead a reasonable, experienced law enforcement officer to believe that someone inside the house ... required immediate assistance.'" *Fitzgerald*, 707 F.3d at 731 (quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (emphasis in *Fitzgerald*)). Cannon's and Taylor's subsequent deposition testimony that nothing happened but consensual sex, and Cannon's claims about Jonathan's motivations, are irrelevant because the officers did not have that information at the time. The officers were responding to what they understood to be an active domestic violence incident. *United States v. Richmond*, 924 F.3d 404, 417 (7th Cir. 2019) ("[W]e judge from the perspective of a reasonably

prudent person in the circumstances before us, not 20/20 hindsight.").

Nor does it matter that Cannon has disputed other parts of the officers' testimony, such as their claims that he answered and then barricaded the door. Cannon points to his testimony that he never answered the door, yelled at officers to leave, or barricaded it—because, as he claims, he and Taylor were having sex at that time. Cannon suggests that his testimony, which must be credited at this stage, casts further doubt on the reasonableness of the officers' actions. But these disputed facts too are immaterial because they do not change the outcome. *See Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). Rather, the undisputed facts of what the officers learned from the 911 call and heard once on the scene were sufficient to render their entry objectively reasonable. Whether Cannon also answered the door and yelled at them to leave does not matter.

Cannon separately challenges the basis for the officers' entry by arguing that the 911 call was facially suspect and should have prompted further inquiry. He contends that dispatchers—and by extension, the officers—should have questioned why the report came from his aunt, who was not on the scene and in a different town, and further should have questioned why the original witness, Jonathan, refused to be involved or speak directly with police. According to Cannon, these irregularities should have led the officers to hesitate before relying on the call and instead to investigate further before entering the home.

We are not convinced. There is nothing inherently suspect about a party calling 911 based on information learned from another person who does not wish to make the call

themselves, particularly when, as here, the caller identified herself and explained in detail how and from whom she learned about the emergency. And there is nothing else in the 911 call as conveyed to the officers that would suggest anything other than a legitimate report of an ongoing domestic violence emergency.

Nor is there anything about the circumstances presented at the scene when officers arrived that would undermine what had been reported to the officers. As we stated in *Richardson*, "we do not exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer." *Richardson*, 208 F.3d at 631. But that is not a concern here. The neighbor's report and the loud noise at the scene would indicate to a reasonable officer that the emergency for which they had been dispatched was potentially ongoing. *Cf. United States v. Delgado*, 701 F.3d 1161, 1163 (7th Cir. 2012) (finding that a 911 call reporting a shooting in the area of a residence did not create exigent circumstances for officers to enter the home, where the other information available to officers after they arrived gave no indication that the shooter or anybody in need of aid was inside). It was therefore objectively reasonable for officers to rely on the information they had and enter the home without investigating further.

In sum, Cannon has failed to dispute the material facts that were known to the officers at the moment they entered his home, and that rendered their warrantless entry reasonable. His Fourth Amendment claim for unlawful entry thus fails as a matter of law.

**II. Cannon's Arrest**

Cannon also challenges the district court's dismissal of his false arrest claim. He argues that there is a genuine dispute of fact over whether the officers had probable cause to arrest him for domestic battery, and that the issue should have gone to a jury. We disagree.

"Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *See Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013). Probable cause to arrest exists "when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." *Jump v. Vill. of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022). "Probable cause does not require certainty"; instead, "[i]t is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (internal quotation marks omitted). Although the existence of probable cause is most often a jury question, the court can make the determination on summary judgment when the underlying facts are undisputed. *Abbott v. Sangamon Cnty., Illinois*, 705 F.3d 706, 714 (7th Cir. 2013).

Here the undisputed facts known to the officers unquestionably provided probable cause to arrest Cannon for battery under Illinois law. *See* 720 ILCS 5/12-3 ("A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature

with an individual.").[2] Taylor's statements to police on the scene provided such cause on their own. Taylor told Officer Filip that Cannon had "gone crazy" and attacked her, and she went further in her recorded statement to Officer Perez—telling the officer that Cannon had beaten and choked her until she went unconscious, and that he had tried to kill her. These statements alone would lead a reasonable officer to believe that Cannon had intentionally caused bodily harm to Taylor, a conclusion further bolstered by the information the officers had learned from the 911 call and their observation of bruising and scratching on Taylor (documented in photographs).

Cannon tries to avoid the above conclusion by pointing to his and Taylor's after-the-fact testimony that they were engaged in nothing but consensual rough sex. Cannon further notes Taylor's later testimony that she did not remember giving her statements to police because she was heavily intoxicated at the time, and that some of what she told the officers was not true.

But as with the exigency issue above, we assess probable cause based on the information available to officers at the time, not with the benefit of hindsight. *See, e.g.*, *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022). Taylor and Cannon's subsequent deposition testimony is immaterial to whether Taylor's statements at the time supported probable cause. There is nothing in the record to suggest the officers should

---

[2] It makes no difference that Cannon was arrested and charged with domestic battery, not ordinary battery, because "an arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that *some* criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect." *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010) (emphasis in original).

not have relied on Taylor's statements as credible, considering they were consistent with the 911 call and the injuries they observed, all of which supported probable cause for his arrest.

***

For all the above reasons, we find the district court properly entered summary judgment on Cannon's claims against the defendant officers, which also required dismissal of his indemnification claim against the city.[3]

## III. Taxation of Costs

The final issue on appeal is the district court's award of costs to Defendants. We will affirm the cost award as long as the lower court "applied the correct standards and avoided arbitrary decisionmaking[.]" *See Montanez v. Simon*, 755 F.3d 547, 555 (7th Cir. 2014).

Cannon does not dispute the amount of the requested costs or challenge any specific item as unwarranted. Instead, he argues that the district court should have excused him from paying costs due to his indigency. He notes that he was appointed counsel in part because he could not afford an attorney, and he contends that it is unfair to tax him for expenses that he incurred only because of that financial need.

---

[3] Because Cannon's claims fail on the merits, we need not address the Defendants' alternative argument that they are shielded by qualified immunity. Cannon's separate arguments that the entry of summary judgment violated his Fifth Amendment right to due process and his Seventh Amendment right to a trial by a jury are squarely foreclosed by precedent. *See, e.g., Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006) ("we previously have rejected arguments that summary judgment violates either the Fifth or Seventh Amendments.").

Cannon also argues that the district court erred by failing to consider additional equitable factors, including his good faith in bringing a civil rights suit and the closeness and difficulty of the issues presented.

On the latter point, Cannon is only half right. In *Rivera*, we recognized that a court can consider factors such as good faith and the closeness of the issues in deciding whether an indigent defendant should be liable for costs. *See Rivera*, 469 F.3d at 635. But we also made clear that these equitable factors come into play only after the district court makes a threshold finding that the losing party is "'incapable of paying the court-imposed costs at this time or *in the future*.'" *Id.* (citation omitted) (emphasis added). That's where Cannon's argument fails. The district court found that he had not shown an inability to pay because he submitted *no* evidence about whether he could afford to pay the roughly $4,000 cost award in the foreseeable future.

This conclusion was not an abuse of discretion. That Cannon required recruited counsel indicated his indigency then, but it does not establish that he would be unable to pay costs in the future. Something more was required, and Cannon failed to produce anything on this point. *Cf. id.* at 637 ("Given that Rivera did not provide the district court with a schedule of expenses and did not identify any basis for a finding that she will be incapable of paying the City's costs at some point in the future, the district court abused its discretion in denying the City's costs.").

In short, the district court did not abuse its discretion in finding that Cannon had not established an inability to pay. The court was therefore not required to consider any other factors, and its ruling stands.

**CONCLUSION**

Accordingly, we AFFIRM the judgment of the district court and AFFIRM the award of costs.