Leonardo VILLEGAS–SARABIA
and Leonardo Villegas, Jr.,
Petitioner–Plaintiffs,

v.

Jeh JOHNSON, Secretary of the Department of Homeland Security, Enrique Lucero, Field Office Director for Immigration and Customs Enforcement, Leon Rodriguez, Director of U.S. Citizenship and Immigration Services, Mario Ortiz, San Antonio District Director for U.S. Citizenship and Immigration Services, and Reynaldo Castro, Warden of the South Texas Detention Center, Respondents–Defendants.

Cv. No. 5:15–CV–122–DAE.

United States District Court,
W.D. Texas,
San Antonio Division.

Signed Aug. 17, 2015.

Lance Edward Curtright, Juan Carlos Rodriguez, De Mott, McChesney, Curtright, Armendariz, San Antonio, TX, for Petitioner–Plaintiffs.

Gary L. Anderson, Assistant United States Attorney, San Antonio, TX, Lindsay Colbert Dunn, Washington, DC, for Respondents–Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART THE GOVERNMENT'S MOTION TO DISMISS AND GRANTING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS*

DAVID ALAN EZRA, Senior District Judge.

Before the Court is a Second Amended Petition for Writ of Habeas Corpus filed by Petitioner Leonardo Villegas–Sarabia ("Petitioner") (Dkt. # 4) and the Original Complaint filed by Petitioner and his father, Leonardo Villegas, Jr. ("Villegas, Jr.").[1] Jeh Johnson, Secretary of the Department of Homeland Security ("DHS"); Enrique Lucero, Field Office Director for Immigration and Customs Enforcement; Leon Rodriguez, Director of U.S. Citizenship and Immigration Services ("USCIS"); Mario Ortiz, San Antonio District Director for USCIS; and Reynaldo Castro, Warden of the South Texas Detention Center (collectively, the "Government") have filed a Motion to Dismiss (Dkt. # 13). The Court held a hearing on the Petition and the Motion to Dismiss on August 6, 2015. At the hearing, Lance E. Curtright, Esq., represented Petitioner. Assistant United States Attorney Gary L. Anderson and Lindsay C. Dunn, Esq., represented the Government. After careful consideration of the Petition and the memoranda supporting and opposing the Government's Motion to Dismiss, the Court, for the reasons that follow, **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss, **DECLARES** that the physical presence requirements under 8 U.S.C. § 1409, as that statute applied at the time of Petitioner's birth, violate the Constitution's guarantee of equal protection under the Fifth Amendment, and **GRANTS** Petitioner's Petition for Writ of Habeas Corpus.

## BACKGROUND

The parties do not dispute the relevant facts of this case. Petitioner was born in Mexico on March 16, 1974. ("Am. Pet.," Dkt. # 4 ¶ 20.) Petitioner's father, Leonardo Villegas, Jr. ("Villegas, Jr."), was born in Eagle Pass, Texas, on August 10, 1955, and is thus a United States citizen by birth. (*Id.* ¶ 17; Dkt. # 13–2, Ex. G.) Villegas, Jr. lived in the United States continuously from his birth in 1955 through 1960, and from 1965 to the present. (Am.Pet. ¶ 17.) Petitioner's mother is a citizen of Mexico. (*Id.* ¶ 19.) Petitioner's parents were not married at the time of his birth. (*Id.* ¶ 21.) A few months after his birth, Petitioner moved with his parents to the United States and subsequently obtained lawful permanent resident status on July 11, 1985, at the age of 10. (*Id.* ¶ 24; Dkt. # 14 at 2.) Petitioner's parents married when Petitioner was 13, and Petitioner was "legitimated" by virtue of their marriage. (Am. Pet. ¶ 22; Dkt. # 14 at 2; Dkt. # 13–7, Ex. G.)

On November 30, 2011, Petitioner was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922. (*Id.* ¶ 25.) Petitioner pled guilty on June 28, 2012, and was sentenced to 30 months imprisonment, with credit for time served since the date of indictment, on June 14, 2013. (Dkt. # 13–2, Ex. B.) Between his plea and his sentencing, Defendant filed an application for a certificate of

---

1. The habeas claim and the claims for declaratory and injunctive relief were separated into two actions following the Magistrate Judge's February 18, 2015 show cause order. (Dkt. # 3.) The Court subsequently found that the claims should not have been separated, and ordered them consolidated on July 30, 2015.

(Dkt. # 23.) Both the Second Amended Petition for Writ of Habeas Corpus filed by Petitioner (Dkt. # 4) and the Original Complaint filed by Villegas, Jr. and Petitioner in civil action number 5:15–cv–160 (Dkt. # 1) are now before the Court.

United States citizenship with USCIS, claiming that he was a derivative citizen through his father. (Am.Pet. ¶ 26.) USCIS denied Petitioner's application on December 12, 2012, on the basis that Petitioner's father was 18 years old at the time of Petitioner's birth and thus could not have met the statutory requirement that he have been physically present in the United States for ten years, five of which must have been after the age of 14, prior to Petitioner's birth. (*Id.* ¶ 27; Dkt. # 13–7, Ex. G.) Petitioner filed a motion before USCIS to reopen the decision on December 7, 2014; as of May 8, 2015, that motion remained pending. (Dkt. # 14 at 2.)

On January 13, 2015, Petitioner was issued a Notice to Appear before an immigration judge for removal proceedings and transferred to the custody of DHS. (Dkt. # 14 at 3.) On January 21, 2015, Petitioner moved for reconsideration of his bond status before the immigration court. (Am. Pet. ¶ 33.) The immigration court held a custody redetermination hearing on January 29, 2015, at which the immigration judge determined that Petitioner should be held without bond pending his removal proceedings pursuant to 8 U.S.C. § 1226(c). (Dkt. # 13–2, Ex. B; Dkt. # 13–3, Ex. C; Dkt. # 13–4, Ex. D.) Petitioner appealed the immigration judge's denial of his motion for bond redetermination on March 23, 2015, arguing that he was not subject to mandatory detention because he is a U.S. citizen under a constitutional interpretation of the derivative citizenship laws. (Dkt. # 13–5, Ex. E.) His appeal was denied by the Board of Immigration Appeals ("BIA"). (Dkt. # 20 at 4 n. 3.) On May 28, 2015, the Immigration Judge issued an order that Petitioner be removed to Mexico, which remains pending on appeal to the BIA. (Dkt. # 17–1, Ex. A; Dkt. # 20 at 2 n. 1.) Petitioner remains in DHS custody.

On February 17, 2015, Petitioner and his father jointly filed an Original Complaint and Petition for Writ of Habeas Corpus. (Dkt. # 1.) In the Complaint and Petition, Petitioner claims that he is a United States citizen and therefore may not be detained under 8 U.S.C. § 1226(c), which provides for the detention of criminal aliens. Petitioner and his father also seek (1) an injunction requiring the USCIS to issue a certificate of citizenship to Petitioner, and (2) a declaration that 8 U.S.C. §§ 1401 and 1409, as those statutes applied to them in 1974, are unconstitutional, and that Petitioner is a citizen of the United States.

On April 24, 2015, the Government filed a Motion to Dismiss. (Dkt. # 13.) After Petitioner filed a Response and the Government filed its Reply, the Court ordered the Government to file a supplemental response addressing Petitioner's equal protection claim. (Dkt. # 16.) The Government filed its supplemental briefing on June 10, 2015, and Petitioner filed a Response to the supplemental briefing on June 24, 2015. (Dkt. ## 17, 20.) Finally, Petitioner filed a notice of new case law on July 10, 2015, to which the Government responded on August 4, 2015. (Dkt. ## 22, 24.)

## DISCUSSION

In his habeas petition, Petitioner argues that his detention by DHS under 8 U.S.C. § 1226 is unlawful because he is a United States citizen. Petitioner's claim of citizenship is based on his argument that the physical presence requirements imposed on unmarried citizen parents of foreign-born children under 8 U.S.C. § 1409, as that statute applied at the time of his birth, unconstitutionally discriminate on the basis of gender in violation of the Fifth Amendment's guarantee of equal protection.[2] Under § 1409(c), a child born

**2.** While the equal protection rights asserted in Petitioner's habeas petition are those of Ville-

abroad to an unwed citizen mother and a non-citizen father acquired citizenship at birth if the mother had previously been physically present in the United States for a continuous period of one year. 8 U.S.C. § 1409(c) (1974). By contrast, under § 1409(a), which incorporates the physical presence requirements of 8 U.S.C. § 1401(a)(7), a child born abroad to an unwed citizen father and a non-citizen mother acquired citizenship at birth only if the father was previously physically present in the United States for ten years, five of which must have been after the age of 14. 8 U.S.C. §§ 1401(a)(7), 1409(a) (1974).[3] Petitioner contends that this gender-based difference violates equal protection, and that the appropriate remedy is to extend the benefits of unmarried citizen mothers of foreign-born children under § 1409(c) to unmarried citizen fathers. Petitioner argues that under this constitutional interpretation of the statutes in question, he is a United States citizen, and his detention as an alien is therefore unlawful.

Additionally, both Petitioner and Villegas, Jr. seek a declaratory judgment that § 1409 is unconstitutional and that Petitioner is a citizen of the United States. Finally, they seek an injunction requiring USCIS to issue Petitioner a certificate of citizenship.

## I. Jurisdiction

### A. Habeas Petition

The posture in which Petitioner's claim is presented requires the Court to first determine whether it has jurisdiction to hear his habeas petition. The REAL ID Act of 2005, Pub. L. 109–13, 119 Stat. 302, governs judicial review of administrative removal orders. See Jean v. Gonzales, 452 F.3d 392, 396 (5th Cir.2006). Under that statute, "the sole and exclusive means for judicial review" of a final order of removal is by filing a petition for review in the proper court of appeals. 8 U.S.C. § 1252(a)(1), (a)(5), (b)(9). Such judicial review includes habeas corpus review under 28 U.S.C. § 2241. Id. § 1252(a)(5),

---

gas, Jr., who was subject to more demanding physical presence requirements in order to transmit his citizenship than those imposed on unmarried citizen mothers, both Petitioner and Villegas, Jr. are parties to this action. Villegas, Jr. has standing to raise his constitutional rights in his claim for declaratory relief, and the constitutional claim may therefore be considered by this Court. See Nguyen v. Immigration & Naturalization Serv., 533 U.S. 53, 58, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001).

3. The statutes provided, in relevant part:

§ 1409. Children born out of wedlock.
(a) The provisions of paragraph[ ] ... (7) of section 1401(a) of this title ... shall apply as of the date of birth to a child born out of wedlock ... if the paternity of such child is established while such child is under the age of twenty-one years by legitimation.

* * *

(c) Notwithstanding the provision of subsection (a) of this section, a person born ... outside the United States and out of wed-

lock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.
Id. § 1409.

§ 1401. Nationals and citizens of United States at birth.
(a) The following shall be nationals and citizens of the United States at birth:

* * *

(7) a person born outside the geographic limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years.
8 U.S.C. § 1401(a)(7) (1974).

(b)(9). The REAL ID Act does not, however, preclude habeas review of challenges to detention that are independent of challenges to a removal order. *See · id.* § 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals ... shall be the sole and exclusive means for judicial review *of an order of removal* entered or issued under any provision of this Act." (emphasis added)); *see also Baez v. Bureau of Immigration & Customs Enforcement,* 150 Fed.Appx. 311, 312 (5th Cir.2005) (non-precedential) (citing H.R.Rep. No. 109–72, at 300 (2005) ("[S]ection 106 would not preclude habeas review over challenges to detention that are independent of challenges to removal orders. Instead, the bill would eliminate habeas review only over challenges to removal orders.")); *Nadarajah v. Gonzales,* 443 F.3d 1069, 1075 (9th Cir.2006) (holding that "the jurisdiction-stripping provision of the REAL ID Act does not apply to federal habeas corpus petitions that do not involve final orders of removal").

Here, Petitioner is not challenging a final removal order. Indeed, there is no final removal order to challenge—Petitioner's appeal to the BIA of the immigration judge's removal order remains pending, (Dkt. # 20 at 2 n. 1), and an order of removal appealed to the BIA does not become final until the BIA affirms the order and dismisses the appeal, 8 U.S.C. § 1101(a)(47)(B); 8 C.F.R. § 1241.1. Petitioner is instead challenging his detention by DHS, which has detained Petitioner as a deportable criminal alien pursuant to 8 U.S.C. § 1226(c). The jurisdiction-stripping provisions of § 1252 therefore do not apply to Petitioner's habeas petition, and the Court has jurisdiction to hear his habeas claim.

The Government argues that Petitioner's habeas claim and his removal proceedings are "inextricably linked," and that by "prejudging Petitioner's citizenship in a habeas proceeding now, the· Court could interfere with Petitioner's final order of removal later." (Dkt. # 17 at 3.). The REAL ID Act, however, does not prohibit district courts from "interfering" with final removal orders that have yet to issue. It instead vests exclusive jurisdiction to hear challenges to final removal orders in the appellate courts. Where a petitioner is not challenging a final removal order, § 1252 does not prohibit a district court from ruling on a habeas petition challenging the lawfulness of the petitioner's detention. The courts will not find habeas review foreclosed absent "a particularly clear statement" of intent from Congress. *Demore v. Kim,* 538 U.S. 510, 517, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). Finding no such statutory statement applicable here, the Court finds that it has jurisdiction over Petitioner's habeas petition.

**B.** *Declaratory and Injunctive Relief*

As set forth above, in addition to Petitioner's habeas claim, Petitioner and Villegas, Jr. also seek a declaration that 8 U.S.C. § 1409, as that statute applied at the time of Petitioner's birth, is unconstitutional, and that Petitioner is a citizen. Petitioner and his father further seek an order requiring USCIS to issue a certificate of citizenship.

A person can affirmatively seek proof of citizenship by filing an application with USCIS under 8 U.S.C. § 1452(a). *Rios–Valenzuela v. Dep't of Homeland Sec.,* 506 F.3d 393, 397 (5th Cir.2007). If the application is denied and the denial is affirmed on administrative appeal, he may seek a judicial declaration of citizenship under 8 U.S.C. § 1503(a). *Id.* Under that statute, "no [declaratory judgment] may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of, in connection with any removal proceeding under the provisions of this chapter or any other act,

or (2) is in issue in any such removal proceeding." § 1503(a).

■ Section 1503(a)(2) thus bars actions seeking a declaration of citizenship where removal proceedings have already been initiated and the petitioner's citizenship is in issue in the removal proceedings. *Rios–Valenzuela*, 506 F.3d at 397 ("[A] purported citizen may not initiate or begin a declaratory judgment action to establish his citizenship if it is already being litigated in a removal proceeding."). Here, Petitioner and Villegas, Jr. brought their action for a declaration of Petitioner's citizenship on February 17, 2015. (Dkt. # 1.) Because Petitioner's removal proceedings were initiated on January 13, 2015, and Petitioner raised his citizenship claim as a defense in those proceedings, this Court is without jurisdiction to declare him to be a United States national, and for the same reason may not issue an order requiring USCIS to issue Petitioner a certificate of citizenship. The Court therefore **DISMISSES** for lack of jurisdiction Petitioner and Villegas, Jr.'s claims for a declaration that Petitioner is a United States national and for an injunction requiring USCIS to issue a certificate of citizenship.

■ The jurisdictional bar of § 1503(a) does not, however, apply to Petitioner and Villegas, Jr.'s claim for a declaration that § 1409 is unconstitutional. By its terms, § 1503(a) applies only to an action by a person denied "a right or privilege as a national of the United States" "for a judgment declaring him to be a national of the United States." It does not act to bar a claim for a declaratory judgment regarding the validity of a federal statute under the Constitution, and the Court therefore has jurisdiction to decide Petitioner and Villegas, Jr.'s claim seeking a declaration

that § 1409 violates equal protection and is unconstitutional.

## II. *Equal Protection*

As discussed above, Petitioner's claim for habeas relief rests on his contention that 8 U.S.C. § 1409, as it applied at the time of his birth, violates the Fifth Amendment's guarantee of equal protection. Under that statute, an unwed citizen mother could confer citizenship on her child born abroad if she had been continuously physically present in the United States for one year at any time prior to the child's birth. § 1409(c). An unwed citizen father, by contrast, could confer citizenship on his child born abroad only if he had been physically present in the United States for a total of ten years prior to the child's birth. §§ 1409(a), 1401(a)(7). Additionally, five of the years of physical presence in the United States must have occurred after the father's fourteenth birthday. *Id.* Under this latter requirement, an 18–year–old citizen father like Villegas, Jr. could not, by definition, transfer his citizenship to a nonmarital child born abroad.

Two appellate courts have considered whether this gender-based difference in an unmarried citizen parent may confer citizenship on his or her foreign-born children violates equal protection. In *United States v. Flores–Villar*, 536 F.3d 990 (9th Cir.2008), a panel of the Ninth Circuit held that the different physical presence requirements for unwed mothers and fathers to confer citizenship on a foreign-born child did not violate equal protection, finding that the physical presence requirements were substantially related to the important government interests of avoiding statelessness and assuring a link between the father, the United States, and the child born abroad.[4] *Id.* at 996–97.

---

4. The Supreme Court granted certiorari and affirmed by an equally divided court, *Flores–Villar v. United States*, 564 U.S. 210, 131 S.Ct.

2312, 2313, 180 L.Ed.2d 222 (2011), rendering the decision non-precedential, *United*

Recently, a panel of the Second Circuit came to the opposite conclusion, holding that the physical presence requirement unconstitutionally discriminated on the basis of gender. *Morales–Santana v. Lynch,* 792 F.3d 256, 270–71 (2d Cir.2015). The question is one of first impression in the Fifth Circuit.

### A. *Standard of Scrutiny*

■ While the Government's brief defends the challenged statute primarily on the basis that it satisfies the heightened scrutiny given to laws that discriminate on the basis of gender, it also argues, in a footnote, that "the deferential review normally applied to congressional actions in the naturalization context should apply here." (Dkt. #17 at 4 n. 4.) Its latest supplemental brief also argues that the Court should apply rational basis review to Petitioner's claims. (Dkt. #28 at 2.) The Court will therefore first consider the proper level of scrutiny to apply to Petitioner's equal protection claim.

■ In general, courts apply heightened scrutiny to laws that discriminate on the basis of gender. *United States v. Virginia,* 518 U.S. 515, 531–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Such "skeptical scrutiny of official action denying rights or opportunities based on sex" reflects the nation's " 'long and unfortunate history of sex discrimination.' " *Id.* at 531, 116 S.Ct. 2264 (quoting *Frontiero v. Richardson,* 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973)). In light of this history, "[p]arties who seek to defend gender-based government action must demonstrate an exceedingly persuasive justification for that action." *Id.*

■ To withstand equal protection review, the State must show that "the challenged classification serves important governmental objectives and that the dis-

criminatory means employed are substantially related to the achievement of those objectives." *Id.* at 533, 116 S.Ct. 2264. "The burden of justification is demanding and rests entirely on the State." *Id.* Additionally, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* "[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

■ The Government's argument for a more lenient standard of scrutiny rests on the principle of judicial deference to government action related to immigration and naturalization. The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2498, 183 L.Ed.2d 351 (2012). As the Supreme Court stated in *Fiallo v. Bell,* "[o]ur cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Shaughnessy v. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Id.* As a result, the "scope of judicial inquiry into immigration legislation" is "limited." *Id.*

In *Nguyen v. INS,* 533 U.S. 53, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001), the Supreme Court assumed, without deciding, that heightened scrutiny applied to an

*States v. Pink,* 315 U.S. 203, 216, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

equal protection challenge of § 1409(a), which requires that a citizen father take affirmative steps not required of citizen mothers in order to transmit citizenship to a nonmarital child born abroad. *Id.* at 61, 121 S.Ct. 2053. In the appeal below, however, the Fifth Circuit held that *Fiallo's* lower standard of review did not apply. *Nguyen v. INS,* 208 F.3d 528, 534–35 (5th Cir.2000), *aff'd,* 533 U.S. 53, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001). The Fifth Circuit found that "there were significant differences between [§ 1409] which is challenged in the present case, and the INA statute challenged in *Fiallo*." *Id.* at 535. In particular, "the statute in *Fiallo* dealt with the claims of aliens for special immigration preferences for aliens, whereas the petitioner's claim in this case is that he is a citizen." *Id.* While recognizing that it had applied *Fiallo* in prior cases involving the claims of aliens, the Fifth Circuit found such cases distinguishable from the petitioner's claim of citizenship and applied heightened scrutiny. *Id.; cf. Malagon de Fuentes v. Gonzales,* 462 F.3d 498, 503–04 (5th Cir.2006) (applying rational basis review to a claim attacking "a congressionally-drawn distinction among aliens"); *Rodriguez v. INS,* 9 F.3d 408, 410 (5th Cir. 1993) (applying *Fiallo* limited review standard to alien's claim seeking waiver of deportation).

Because the Supreme Court's *Nguyen* opinion affirmed the Fifth Circuit's decision, the Fifth Circuit's holding regarding the applicable standard of scrutiny remains binding on this Court. As in *Nguyen,* Petitioner's claim here is that he is a citizen as of the time of his birth. The challenged statute deals not with aliens'

claims for immigration preferences, but with how citizen parents may confer citizenship on nonmarital children born abroad. The Court therefore finds that the Fifth Circuit's holding in *Nguyen* requires that heightened scrutiny be applied to Petitioner's claims.

The Court also notes that the Second Circuit held that heightened scrutiny applied to an equal protection challenge to the physical presence requirements in question here, rejecting the Government's argument that *Fiallo* limits the court's inquiry to rational basis scrutiny. *Morales–Santana,* 792 F.3d at 263–64. The Second Circuit, as did the Fifth Circuit in *Nguyen,* distinguished *Fiallo* on the basis that the laws challenged in that case governed the admission of non-citizens to the United States through a citizen parent. While "the children's alienage [in *Fiallo*] implicated Congress's 'exceptionally broad power' to admit or remove non-citizens," the petitioner in *Morales–Santana* claimed "pre-existing citizenship at birth," and thus raised "no similar issue of alienage that would trigger special deference." *Id.*

In addition to finding that the Fifth Circuit's holding in *Nguyen* governs the applicable standard of scrutiny here, the Court further finds its analysis, and that of the Second Circuit, to be persuasive. Petitioner claims that under a constitutional interpretation of the challenged statutes, he is a citizen as of the date of his birth. He is not challenging the denial of an application for immigration status or any other government action that could be said to implicate the congressional "power to admit or exclude foreigners" at issue in *Fiallo.*[5] 430 U.S. at 796 n. 6, 97 S.Ct.

---

5. The Government argues that Petitioner's claim for citizenship is one of naturalization, and that Congress's sole authority to "establish a uniform Rule of Naturalization" under article I, section 8, clause 4 of the Constitution requires that the Court grant deference to the conditions for naturalization set by Congress. The Government supplies no authority for its assertion, however, that "the power to confer or deny citizenship to individuals born abroad ... is also an aspect of the power to exclude aliens."

1473. In its discussion of the scope of judicial review in cases concerning aliens, the *Fiallo* court expressly distinguished laws that apply to aliens from those that apply to citizens, noting that "in the exercise of its broad power of immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 792, 97 S.Ct. 1473 (quoting *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)). The laws challenged here apply to citizens, setting out the requirements for how citizen mothers and citizen fathers may confer citizenship on their nonmarital, foreign-born children where the other parent is a non-citizen. The gender-based scheme provided for under the statutes must therefore satisfy the full rigor of the Constitution's guarantee of equal protection, and can be upheld only if the Government can show that it is substantially related to an important governmental interest.

Contrary to the Government's position, Congress did not view the conferral of citizenship by an unmarried citizen parent on a child born abroad to be a naturalization. The parallel provision of the Nationality Act of 1940 appeared in Chapter II of that Act, titled "Nationality at Birth." § 205, 4 Stat. at 1138, 1139–40. The provisions pertaining to naturalization, by contrast, appeared in Chapter III: "Nationality Through Naturalization." *Id.* at 1140. Similarly, the parallel provision of the Immigration and Nationality Act of 1952 appeared in Chapter 1 of Title III, titled "Nationality at Birth and by Collective Naturalization." § 309, 66 Stat. at 238–39. (The "collective naturalization" provisions conferred citizenship on certain persons born in the Canal Zone and the Republic of Panama, Puerto Rico, Alaska, Hawaii, the Virgin Islands, and Guam. *Id.* §§ 302–07, 66 Stat. at 236–38.) The provisions pertaining to naturalization generally were set out in Chapter III, "Nationality Through Naturalization." *Id.* at 249.

. The relevant provisions at issue here thus did not appear in the respective chapters of the 1940 and 1952 statutes setting out the provisions for naturalization, but in the chapters providing for "Nationality at Birth." Ad-

## B. *Governmental Interests and Tailoring*

In defense of the statutes at issue, the Government argues that the gender-based difference in the physical presence requirements for transfer of citizenship by unmarried parents to a foreign-born child are substantially related to the important governmental interests of preventing statelessness among children born abroad and developing a tie between the child, the citizen parent, and this country. The Court will consider each of these interests in turn.

### 1. *Preventing Statelessness*

 The Government argues that the statutes at issue advance the important government interest of preventing statelessness. The potential problem of statelessness arises out of the interaction of the United States' rule of *jus solis*, which assigns citizenship based on the place of

ditionally, § 205 of the 1940 Act and § 209 of the 1952 Act explicitly incorporate parts of §§ 201 and 301, respectively, which set out who "shall be nationals and citizens of the United States at birth." § 201, 54 Stat. at 1138; § 301, 66 Stat. at 235. The statutory structure of both Acts thus indicates that Congress considered conferral of citizenship by an unmarried citizen parent to a child born abroad to be the conferral of citizenship at birth, not a naturalization.

The Supreme Court has reached the same conclusion. In *Rogers v. Bellei,* the Court noted that the foreign-born child of a married citizen mother "acquired citizenship at his birth." 401 U.S. at 818, 91 S.Ct. 1060. Significantly, the applicable statute at the time also required that the foreign-born child subsequently live in the United States for five years between the ages of 14 and 28. *Id.* at 816, 91 S.Ct. 1060. The Court nevertheless recognized that the child was a citizen at birth under the statute, characterizing his citizenship as "presumptive citizenship" subject to a condition subsequent. *Id.* at 835, 91 S.Ct. 1060. The Court is therefore satisfied that Petitioner's citizenship claim here does not implicate Congress's powers over naturalization. ·

birth (except as provided for by statute), and the rule of *jus sanguinis* adopted by many other nations, under which citizenship is acquired by blood relationship with a parent. *See Rogers v. Bellei*, 401 U.S. 815, 828, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971) (noting that the United States follows the rule of *jus solis* except as modified by statute); Brief for Respondent at 17–18, *Nguyen*, 533 U.S. 53, 2000 WL 1868100 (No. 99–2071). A child born out of wedlock abroad would be stateless if she was born in a *jus sanguinis* country and was unable to inherit the citizenship of either of her parents—for example, where a foreign country provided inheritance of citizenship from the mother, and no U.S. statute provided for transmission of citizenship by a citizen mother to a child born abroad. *See Morales–Santana*, 792 F.3d at 267; *Runnett v. Shultz*, 901 F.2d 782, 787 (9th Cir.1990).

The Supreme Court has recognized the harsh consequences of statelessness, *see Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 160–61, 83 S.Ct. 554, 9 L.Ed.2d 644 (1967); *Trop v. Dulles*, 356 U.S. 86, 101–02, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), and both the Ninth and Second Circuits have recognized the prevention of statelessness as an important government interest in light of this precedent, *Flores–Villar*, 536 at 996; *Morales–Santana*, 792 F.3d at 267. Whether the prevention of statelessness was in fact Congress's purpose in establishing the different physical presence requirements at issue here, however, is doubtful. As noted above, "the court must inquire into the actual purposes of the discrimination, for 'a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded.'" *Nguyen*, 533 U.S. at 76, 121 S.Ct. 2053 (O'Connor, J., dissenting) (quoting *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264). The Government's argument with regard to statelessness relies entirely on the Ninth Circuit's opinion in *Flores–*

*Villar*, which appears to assume without considering whether preventing statelessness in fact motivated the physical presence requirement enacted by Congress. *See Flores–Villar*, 536 F.3d at 996–97.

The provisions in question were first enacted in 1940, and marked the first time that Congress had differentiated between children born out of wedlock and children born to married parents in its *jus sanguinis* statutes. Nationality Act of 1940, ch. 876, § 205, 54 Stat. 1137, 1139–40; Brief for Professors of History, Political Science, and Law as Amici Curiae Supporting Petitioner at 21, *Flores–Villar*, 131 S.Ct. 2312, 2010 WL 2602009 (2011) (No. 09–5801) ("Professors' Amicus Brief"); Kristin A. Collins, *Illegitimate Borders: Jus Sanguinis Citizenship and the Legal Construction of Family, Race, and Nation*, 123 Yale L.J. 2134, 2136 n. 2 (2014). Section 205 of the Nationality Act of 1940 ("1940 Act") provided that, in the case of a child born abroad to parents of whom only was a citizen, "citizen fathers and married citizen mothers could transmit citizenship to their child born abroad only after satisfying an age-calibrated ten-year physical presence requirement, but ... *unmarried* citizen mothers could confer citizenship if they had resided in the United States at any point prior to the child's birth." *Morales–Santana*, 792 F.3d at 267–69 (emphasis in original); § 205, 54 Stat. at 1139–40 (incorporating § 201(g)). The Immigration and Nationality Act of 1952 ("1952 Act") retained this basic structure, but added an additional requirement that unmarried mothers have been continuously physically present in the United States for one year prior to the child's birth. Immigration and Nationality Act of 1952, § 309(c), 66 Stat. 163, 238–39.

The purpose of these statutes is best determined in light of their historical contexts. *See United States v. Zacks*, 375

U.S. 59, 62, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963). From 1790 until 1934, foreign-born children acquired the citizenship of their father. Professors' Amicus Brief at 7 (citing Act of Feb. 10, 1855, ch. 71, § 1, 10 Stat. 604, 604; Act of Apr. 14, 1802, ch. 28, § 4, 2 Stat. 153, 155; Act of Jan. 29, 1795, ch. 20, § 3, 1 Stat. 414, 415; Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, 104). Citizenship law throughout this period codified "the well-established norm of male headship in the marital family," under which "the husband determined the political and cultural character of his dependents—wife and children included." *Id.* at 7–9. Women lacked the ability to transmit their citizenship to their children, and for some of this period were even subject, by court interpretation and later by statute, to the loss of their American citizenship upon marriage to a foreign husband. *Id.* at 11–13; Collins, 123 Yale L.J. at 2156; Candice Bredbenner, *A Nationality of Her Own: Women, Marriage, and the Law of Citizenship* 45–58 (1998) ("Bredbenner"); *see also Miller v. Albright,* 523 U.S. 420, 463–68, 118 S.Ct. 1428 (Ginsburg, J., dissenting).

The rule of paternal transfer of citizenship did not apply, however, to children born outside of marriage. While foreign-born children of married and unmarried parents were not distinguished by statute prior to the 1940 Act, courts and government agencies interpreted the statutes to refuse citizenship to nonmarital children born abroad to citizen fathers.[6] Collins, 123 Yale L.J. at 1258–60, 2182–83; Professors' Amicus Brief at 21. This interpretation in part reflected prevailing domestic relations law, which "generally insulated men from their nonmarital children by disfavoring those children's claims to property and status" and "resisted recognition of the father-child relationship outside of marriage." Professors' Amicus Brief at 20–21. Professor Collins persuasively argues that this interpretation was also used as a facially neutral tool of racial exclusion. *See* Collins, 123 Yale L.J. at 1258–88. In the historical context of expanding American empire, increasing Asian immigration, and anti-miscegenation laws, "restriction of father-child citizenship transmission outside the marital family regularly operated to exclude nonwhite children from citizenship." *Id.* at 2158.

By contrast, judicial and administrative practice recognized the citizenship of non-marital children born abroad to citizen mothers even before Congress provided for citizenship transfer by mothers to their children in 1934. *Id.* at 1258–60, 2182; *Morales–Santana,* 792 F.3d at 267–69 (quoting *To Revise and Codify the Nationality Laws of the United States Into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigration and Naturalization,* 76th Cong. 431 (1945)); Professors' Amicus Brief at 28–29. The recognition of the mother-child relationship in the nonmarital context was a reflection of American common law, which recognized the mother-child relationship outside of marriage under the principle that "the mother in such a case stands in the place of the father," itself founded on the presumption that the mother was the natural caregiver. Collins, 123 Yale L.J. at 2200–01; Professors' Amicus Brief at 27–29 & n. 11; *see also Nguyen,* 533 U.S. at 91–92, 121 S.Ct. 2053 (O'Connor, J., dissenting) (discussing history of legitimation requirement first enacted by 1940 Act); *Miller,* 523 U.S. at 463, 118 S.Ct. 1428 (Ginsburg, J., dissenting). Additionally, "[t]he historical sources suggest that ad-

**6.** The State Department's practice provided an exception for nonmarital children born abroad who were legitimated by the citizen father during the child's minority. Collins, 123 Yale L.J. at 2183–84; Professors' Amicus Brief at 22.

ministrators' recognition of mother-child citizenship transmission outside of marriage was animated by the powerful maternalist norms that shaped early twentieth-century social policy," which were "premised on the view that mothers were the natural caregivers of children."[7] Collins, 123 Yale L.J. at 2201.

The 1940 Act was originally drafted by a presidentially appointed interdepartmental committee of officials from the Departments of State, Labor (which housed the Bureau of Immigration), and Justice. *Id.* at 2189, 2190–91. The drafters incorporated the existing administrative practice recognizing the citizenship of nonmarital children born to citizen mothers and strictly limiting the transmission of citizenship to children born to citizen fathers in the proposed law. *Id.* at 2198, 2199–2200, 2205 (citing *H.R. Comm. on Immigration & Naturalization, 76th Cong., Report Proposing an Revision and Codification of the Nationality Laws of the United States, Part One: Proposed Code with Explanatory Comments* (Comm. Print 1939) ("Proposed Code") at 17–18); Professors' Amicus Brief at 25–26, 28–29. As noted by Professor Collins, "the drafters of the Proposed Code explained the recognition of unwed mothers' foreign-born children as citizens using the formalized (and gender-based) logic of the common law: it was premised on the longstanding domestic relations law principle that 'the mother in such a case stands in the place of the father.'" Collins, 123 Yale L.J. at 2200 (quoting Proposed Code at 18).

The exclusionary immigration policies of the first nearly two-thirds of the 20th century are also essential to a full understanding of the historical context of the 1940 Act. Calls to allow women to transmit their citizenship to their foreign-born children were met with fears from administration officials and members of Congress that such a policy would result in an influx of immigrants who were otherwise excluded under racially-based immigration statutes. *Id.* at 2192–96; Bredbenner at 232–33. The requirement that a child born outside of the United States to one citizen parent live in the United States for five years between the ages of 13 and 21, enacted in the 1934 law that gave American mothers the ability to transmit citizenship and retained in the 1940 statute, Act of May 24, 1934, ch. 344, 48 Stat. 797; Nationality Act of 1940, ch. 876, § 201(g), 54 Stat. 1137, 1139, was intended by at least some legislators to exclude from citizenship "children of citizens who were otherwise racially excludable." Collins, 123 Yale L.J. at 2194 (quoting the colloquy of Senators King and Copeland, 78 Cong. Rec. 8471 (1934)). Similarly, the ten-year residency requirement in the 1940 Act was explained by a State Department official, in testimony before Congress on the legislation, as an improvement over the 1934 law because "[i]t does not result in spreading citizenship over the face of the earth quite so much . . . among aliens," with explicit reference to citizens of "Chinese or Mexican descent." *To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigration and Naturalization,* 76th Cong. 40 (1945).

There is thus evidence that the differential treatment of citizen mothers and fa-

---

**7.** The maternalist justifications "largely originated in the practices of front-line administrators in the Bureau of Immigration" dealing with crossings of the Canadian–American border by mothers and their children. Collins, Yale L.J. at 2201–04. "Memo after memo explaining and defending the cross-border agreement [between the United States and Canada] reveals U.S. officials' nearly uniform view that it was only practical to keep mothers and their nonmarital children [born abroad] together, as mothers were the presumed caretakers of such children." *Id.* at 2202–03.

thers with respect to the conferral of citizenship on nonmarital children born abroad stemmed from traditional gender roles embodied in American common law, the maternalist norms of policymakers, and a nativist desire to keep derivative citizenship from circumventing racially restrictive immigration policies. The Court has found no evidence, by contrast, that this gender classification was motivated by preventing statelessness. The Second Circuit, in considering whether preventing statelessness was a genuine justification for the different physical presence requirements at issue here, found that "[n]either the congressional hearings nor the relevant congressional reports concerning the 1940 Act contain any reference to the problem of statelessness for children born abroad," and that "[t]he congressional hearings concerning the 1952 Act are similarly silent about statelessness as a driving concern." *Morales–Santana*, 792 F.3d at 268. While the issue of statelessness was raised with reference to other provisions of the 1940 and 1952 legislation, there is no evidence that is was a concern relative to the physical presence requirements for unmarried citizen mothers and fathers. *See* Proposed Code at 20 (noting the prevention of statelessness as the purpose of a provision conferring U.S. nationality on children of unknown parentage found in an outlying possession of the United States); S.Rep. No. 82–1137, at 39 (1952) (explaining, with reference to statelessness, the elimination of a provision conditioning a citizen mother's ability to transmit her citizenship to a nonmarital child born abroad on the father's failure to legitimate the child before the child's 18th birthday); Collins, 123 Yale L.J. 2205 n. 283 ("[I]n the many hundreds of pre–1940 administrative memos I have read that defend or explain

recognition of the nonmarital foreign-born children of American mothers as citizens, I have identified exactly one ... that mentions the risk of statelessness ... as a concern.").

■■■■ The Government has therefore not met its burden of showing that preventing statelessness was a genuine justification for the challenged classification. Further, even if the prevention of statelessness did motivate the different treatment of physical presence requirements for citizen mothers and fathers, the Government has not shown that the classification is substantially related to that interest. "[T]he availability of sex-neutral alternatives to a sex-based classification is often highly probative of the validity of the classification." *Nguyen*, 533 U.S. at 78, 121 S.Ct. 2053 (O'Connor, J., dissenting); *see also Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980) (striking down a gender-based classification where a gender-neutral approach would advance the goals of the statutory scheme equally well); *Orr v. Orr*, 440 U.S. 268, 281–83, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (same). Here, gender-neutral alternatives would equally, if not better, serve the goal of preventing statelessness in nonmarital children born abroad.

During the time leading up to the 1940 Act, statelessness was recognized as a potential problem for the nonmarital children of both citizen mothers *and* citizen fathers. Professors' Amicus Brief at 33–36 (citing Catheryn Seckler–Hudson, *Statelessness: With Special Reference to the United States* (1934)).[8] In 1933, Secretary of State Cordell Hull proposed legislation to the chairman of the relevant House committee that would have granted citizenship

---

**8.** Seckler–Hudson's work was later cited by the Supreme Court in its discussions of statelessness in *Mendoza–Martinez*, 372 U.S. at

161 n. 15, 83 S.Ct. 554, and *Trop*, 356 U.S. at 102 n. 35, 78 S.Ct. 590. *See also* Professors' Amicus Brief at 33 n. 17.

to a child born abroad out of wedlock to either an American father or an American mother if there was "no other legal parent under the law of the place of birth," a gender-neutral solution to the risk of statelessness for children of citizen mothers and citizen fathers. *Morales–Santana*, 792 F.3d at 270 (quoting Letter from Sec'y Hull to Chairman Dickstein (Mar. 27, 1933)). In the lead-up to what would become the 1934 Act, Congress was twice presented with gender-neutral bills that would have addressed the problem of statelessness with respect to mothers as well as fathers. *See Amendment to the Women's Citizenship Act of 1922, and for Other Purposes: Hearings on H.R. 14,684, H.R. 14,685, and H.R. 16303 Before the H. Comm. on Naturalization and Immigration*, 71st Cong. 1 (1931); *Relating to Naturalization and Citizenship Status of Certain Children of Mothers Who are Citizens of the United States, and Relating to the Removal of Certain Distinctions in Matters of Nationality: Hearings on H.R. 5489 Before the H. Comm. on Naturalization and Immigration*, 72d Cong. 1 (1932).[9]

Congress and administration officials thus do not appear to have viewed the risk of statelessness as especially acute in the case of children born abroad to citizen mothers as opposed to citizen fathers. The Government has presented no evidence that statelessness was in fact a greater concern in the context of children born abroad to citizen mothers. *Cf.* Brief for Scholars on Statelessness as Amici Curiae Supporting Petitioner 8–15, 22–28, *Flores–Villar*, 131 S.Ct. 2312, 2010 WL 2569160 (No. 09–5801) ("There is no support for the government's assertion that

the risk of statelessness for non-marital children of U.S. mothers was or is much higher than for U.S. fathers of non-marital children born abroad, or indeed any higher at all."). Even had this been the case, the Court can discern no reason why a gender-neutral alternative could not have addressed this concern as well, or indeed better, than the gender-based requirement. As recognized at the time, a non-marital child born to a citizen father in a *jus sanguinis* country in which citizenship is acquired through the father would be stateless if the child could not acquire the father's American citizenship. Professors' Amicus Brief at 34–35 (citing Seckler–Hudson at 221, 224–25). Applying § 1409(c)'s physical presence requirement for unmarried citizen mothers to unmarried citizen fathers would thus advance the goal of preventing statelessness of citizen mothers' children equally well while further advancing that goal with respect to the children of citizen fathers.

Given the availability of gender-neutral alternatives that would advance the goal of preventing statelessness equally well or better than the gender-based physical presence requirements at issue here, the Court finds that the physical presence requirements are not substantially related to the achievement of the objective of preventing statelessness in children born abroad. As a result, even if the prevention of statelessness did in fact motivate Congress's passage of the physical presence requirements for citizen mothers and fathers to transmit their citizenship to non-marital children born abroad, that interest cannot support the requirements' discrimi-

---

9. Both bills included language to the effect that "Any child, whether legitimate or illegitimate, born out of the limits and jurisdiction of the United States, whose father or mother may be at the time of the birth of such child a citizen of the United States, is declared to be a citizen of the United States; but the right of citizenship shall not descend to any child whose father or mother had never resided in the United States previous to the birth of the child." H.R. 14,684, 71st Cong. § 3 (1930); *see also* H.R. 5489, 72d Cong. (1931).

natory treatment of unmarried citizen mothers and fathers.

### 2. Ensuring a Connection to this Country

■ The Government also argues that the different physical presence requirements applied to citizen mothers and fathers is substantially related to the interest in "ensur[ing] some tie between this country and one who seeks citizenship." (Dkt. # 17 at 7 (quoting *Nguyen*, 533 U.S. at 68, 121 S.Ct. 2053).) The Second Circuit found, and Petitioner has not contested here, that ensuring a sufficient connection between foreign-born children of parents of different nationalities and the United States is important and was actually contemplated by Congress in requiring some period of physical presence before a citizen parent could confer citizenship on a child born abroad. *See Morales–Santana*, 792 F.3d at 265–66.

The Second Circuit, in analyzing whether the different residency requirements for unmarried fathers and mothers was substantially related to this interest, could "see no reason[ ] that unwed fathers need more time than unwed mothers in the United States prior their child's birth in order to assimilate the values that the statute seeks to ensure are passed on to citizen children born abroad." *Morales–Santana*, 792 F.3d at 265. This Court wholly agrees. The Court can think of no rational basis for the idea that an unmarried citizen father needs more time—indeed, ten times as many years—to absorb American values than an unmarried citizen mother. The Court is equally unable to find a reason why an unmarried citizen father requires five years of U.S. residence after the age of 14 to sufficiently assimilate American values, while an unmarried citizen mother's absorption of American val-

ues is considered sufficient even if her one year of residence occurred in her infancy.[10]

As it did before the Second Circuit, the Government here cites *Nguyen* as support for the proposition that the gender-based physical presence requirements are substantially related to ensuring an adequate connection between the child and this country. In *Nguyen*, the Supreme Court rejected a challenge to the Immigration and Nationality Act's requirement that an unwed citizen father affirmatively legitimate a child born abroad, declare his paternity under oath, or obtain a court order of paternity in order to transmit his citizenship to the child. *Nguyen*, 533 U.S. at 62, 121 S.Ct. 2053. The Court recognized two important interests that supported the legitimation requirement: ensuring the existence of a biological parent-child relationship, and ensuring "that the child and the citizen parent have some demonstrated opportunity or potential to develop" a meaningful relationship. *Id.* at 62, 64–65, 121 S.Ct. 2053.

As the Second Circuit explained, neither of these interests applies to the physical presence requirements at issue here. First, the physical presence requirements do nothing to ensure that a biological parent-child relationship exists; that function is fulfilled by the separate requirement that unwed citizen fathers legitimate their foreign-born children. *See* § 1409(a) (1974). A father's physical presence in the United States for ten years instead of just one prior to his child's birth "would have provided no additional assurance that a biological tie existed." *Morales–Santana*, 792 F.3d at 266. Second, the physical presence requirement similarly does nothing to ensure that the child and the citizen father have an opportunity to develop a meaning-

---

**10.** The Court notes that while the Ninth Circuit found that the residence differential furthers the objective of developing a tie between the child, his or her father, and this country, it provided no explanation for how it did so. *Flores–Villar*, 536 F.3d at 997.

ful relationship. The length of time a citizen father spends in the United States prior to his child's birth abroad has no effect on the father's subsequent opportunity to establish a relationship with the child. Requiring Villegas, Jr. to reside in the United States for ten years, including five years after his 14th birthday, rather than one year "would have done nothing to further ensure that an opportunity for such a relationship existed." *Id.*

The analysis of whether the different physical presence requirements for unwed citizen mothers and fathers is substantially related to the interest in ensuring the opportunity to develop a meaningful relationship between the citizen parent and child is thus not governed by the Supreme Court's analysis in *Nguyen.* As noted by the Second Circuit, "unwed mothers and fathers are similarly situated with respect to how long they should be present in the United States ... prior to the child's birth in order to have assimilated citizenship-related values to transmit to the child." *Morales–Santana,* 792 F.3d at 266 (emphasis omitted). The Court therefore finds that the interest in ensuring the opportunity to develop a meaningful relationship cannot support the gender-based difference in physical presence requirements for unwed citizen mothers and fathers.[11] Lacking a substantial relationship to an important government interest, the different physical presence requirements violate the Fifth Amendment's guarantee of equal protection.[12]

## C. Remedy

■■■ Having found that the different physical presence requirements for unmarried citizen mothers and fathers in § 1409(c) and (a), respectively, violate equal protection, the Court must determine the proper remedy. "[W]hen the right invoked is that of equal treatment, the remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler v. Mathews,* 465 U.S. 728, 740, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) (quoting *Iowa–Des Moines Nat'l Bank v. Bennett,* 284 U.S. 239, 247, 52 S.Ct. 133, 76 L.Ed. 265 (1931)). The remedy chosen must be consistent with congressional intent in enacting the law in question, and "should therefore measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation." *Id.* at 739 n. 5, 104 S.Ct. 1387 (quoting *Welsh v. United States,* 398 U.S. 333, 365, 90 S.Ct. 1792, 26

11. In its latest supplemental briefing, the Government suggests that § 1409(c) also furthers the important governmental interest of ensuring that a foreign-born child would not be separated from its citizen mother, asserting that a citizen mother would otherwise have had to choose between returning to the United States without her child and remaining abroad with the child. (Dkt. # 28 at 7.) First, the Government has provided no evidence that Congress actually had such a consideration in mind when drafting the statute. Second, the Government has not explained why an unwed citizen mother would be forced to make such a choice. At the time of Petitioner's birth, the foreign-born child of a citizen mother could be admitted to the Unit-

ed States as a permanent resident, and the parent could then petition for the child's naturalization. *See* 8 U.S.C. § 1433(a) (1974).

12. The current form of § 1409, which retains the one-year continuous presence requirement for unwed citizen mothers and requires that unwed citizen fathers be physically present in the United States for five years, two after attaining the age of fourteen, 8 U.S.C. §§ 1409(a) & (c), 1401(g), is not before the Court. The Court notes, however, that the current statute, insofar as it requires unmarried fathers to meet a more burdensome physical presence requirement than unmarried citizen mothers, suffers from the same constitutional infirmity as its predecessor.

L.Ed.2d 308 (1970) (Harlan, J., concurring in the result)). Provided that it does not violate the intent of Congress, "ordinarily, extension, rather than nullification, is the proper course...." *Id.* (quoting *Califano v. Westcott*, 443 U.S. 76, 91, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979)).

In its analysis of the proper remedy, the Second Circuit set out three options: (1) striking § 1409(a) and (c) entirely; (2) severing the one-year continuous presence requirement of § 1409(c) and requiring unwed citizen parents to satisfy the ten-year requirement if the other parent lacks citizenship; or (3) severing the ten-year requirement of § 1401(a)(7) as incorporated by § 1409(a) and requiring every unwed citizen parent to satisfy the one-year continuous presence requirement if the other parent is not a citizen. *Morales–Santana*, 792 F.3d at 270–71. The first option, which is not advocated by either Petitioner or the Government, is foreclosed by the 1952 Act's severability provision, which provides that "[i]f any particular provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act ... shall not be affected thereby." § 406, 66 Stat. at 281. Given Congress's intent that an invalid provision not affect other provisions of the Act, and because § 1409(a) and (c) violate equal protection only in combination, only one should be severed. *See Morales–Santana*, 792 F.3d at 270–71; *see also United States v. Cervantes–Nava*, 281 F.3d 501, 505 n. 11 (5th Cir.2002) ("Courts should

select the severance option most compatible with the statute's original text and structure, because severance is based on the assumption that Congress would have enacted the remainder of the law absent the severed portion.").

The Government argues for the second option, contending that the proper remedy is to apply the longer physical presence requirements applicable to unwed citizen fathers to unwed citizen mothers. (Dkt. # 17 at 12.) In support of this position, the Government argues that the one-year continuous presence requirement for unmarried citizen mothers is an exception to the ten-year requirement, applicable to married mothers, married fathers, and unmarried fathers, that must otherwise be fulfilled to transfer citizenship to a child born abroad to parents of whom only one is a citizen. *See* §§ 1401(a)(7), 1409(a), (c).[13] According to the Government, extending the one-year requirement for unmarried citizen mothers to unmarried citizen fathers would allow the exception to swallow the rule.

While the Court would not characterize an extension of the one-year presence requirement to unmarried fathers as "swallowing the rule," given that the ten-year requirement would continue to apply to married mothers and fathers, the Government's argument is not without merit. The Court is not persuaded, however, that Congress would have preferred to apply the ten-year presence requirement to all unmarried citizen parents rather than ex-

---

**13.** The Government also argues that Congress has continued to apply the longer physical presence requirement applicable to married citizen parents of children born abroad to unmarried citizen fathers, citing the 1986 amendments to the Immigration and Nationality Act and various legislation proposed but not adopted thereafter. (Dkt. # 17 at 13.) The relevant inquiry, however, is Congress's intent in enacting the provisions and statutory scheme at issue in this case—the Immigration

and Nationality Act of 1952. *See New York v. United States*, 505 U.S. 144, 186, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (framing the question of severability as whether the legislature that enacted the statute would have enacted the remaining provisions absent the provision subsequently found invalid); *Cervantes–Nava*, 281 F.3d at 505 n. 11 ("Courts should select the severance option most compatible with the statute's *original text and structure* ...." (emphasis added)).

tend the one-year continuous presence requirement to unmarried citizen fathers. As noted by the Second Circuit, "the ten-year requirement for fathers and married mothers imposed by Congress in 1940 appears to have represented a significant departure from long-established historical practice." *Morales–Santana*, 792 F.3d at 271. Until 1940, children born to one citizen parent and one alien parent were recognized as citizens if the citizen parent had resided in the United States for any length of time.[14] *See Rogers v. Bellei*, 401 U.S. 815, 823–26, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971) (reviewing the history of the derivative citizenship statutes).

The ten-year physical presence requirement was created for the first time by the 1940 Act, and required that five of those years occur after the age of 16. Nationality Act of 1940, § 201(g), 54 Stat. at 1139. The 1952 Act added the one-year continuous presence requirement for unmarried citizen mothers, "a relatively minor change in the baseline minimal residency requirement applicable to all men and women prior to 1940" as well as to unmarried citizen mothers from 1940 to 1952. *Morales–Santana*, 792 F.3d at 272. *Compare* Nationality Act of 1940, § 201(g), 54 Stat. at 1139, *with* Immigration and Nationality Act of 1952, § 309(c), 66 Stat. at 238–39. The 1952 Act also changed the age-based portion of the ten-year requirement so that the five years were counted from the age of 14, extending the possibility of citizenship to children born to 19–year–old unwed citizen fathers. § 301(a)(7), 66 Stat. at 236. It did, however, retain the ten-year residency requirement for married citizen parents and unmarried citizen fathers.[15] *Id.*

The history of the provisions in question thus shows that while the residency requirement for transmission of citizenship to foreign-born children was satisfied by residence of any duration for much of the nation's history, Congress in 1952 chose to retain the ten-year requirement first provided for in the 1940 Act. The Second Circuit's examination of Congress's intent with respect to the physical presence requirements of the 1952 Act found that "[n]either the text nor the legislative history of the 1952 Act is especially helpful or clear." *Morales–Santana*, 792 F.3d at 272. Having conducted its own review of the legislative history of the 1952 Act, this Court agrees. The House Report on the bill that became law noted only, with respect to the ten-year physical presence requirement, that the proposed legislation allowed service in the Armed Forces to count toward physical presence in light of the "many members of our Armed Forces serving abroad who have married alien spouses and have children born in foreign countries." H.R.Rep. No. 82–1365, at 76 (1952). The Senate Report similarly offered no explanation of the ten-year physical presence requirement beyond the computation of presence for Armed Forces serving abroad. S.Rep. No. 82–1137, at 39 (1952). The report of the Senate Judiciary Committee on its comprehensive study of the nation's immigration laws recommended the physical presence provisions that were subsequently enacted, but its

14. As noted above, citizen mothers were unable to transmit their citizenship until 1934. Under the 1934 Act, however, a citizen mother was able to transmit her citizenship to a child born abroad if she had resided in the United States for any duration. Act of May 24, 1934, ch. 344, § 1993, 48 Stat. 797; *see also Bellei*, 401 U.S. at 823–26, 91 S.Ct. 1060; *Morales–Santana*, 792 F.3d at 270–71.

15. The 1952 Act further specified that the ten-year requirement was one of physical presence. § 301(a)(7), 66 Stat. at 236. The 1940 Act had used the term "residence," which was viewed as less precise. § 201(g), 54 Stat. at 1139; S. Rep. 81–1515, at 713 (1950).

only commentary on the relevant provisions was to note that the residence requirements for citizen parents of children born abroad "are confusing and difficult to administer and interpret." S.Rep. No. 81–1515, at 713 (1950). The hearings on the legislation provide no additional insight. *See Revision of Immigration, Naturalization, and Nationality Laws: Joint Hearings before the Subcomms. of the Comms. on the Judiciary,* 82d Cong. (1951).

The Court next looks to the legislative history of the 1940 Act, whose physical presence provisions were "carrie[d] forward substantially" by the 1952 Act. H.R.Rep. No. 82–1365, at 76 (1952). The Senate Report's explanation of the legislation, under the heading "Further Restrictive Provisions," states:

> Under present law a child born outside of the limits and jurisdiction of the United States of one citizen and one alien parent becomes a citizen at birth, provided the citizen parent has resided in the United States before the birth of the child. No prescribed period of residence in this country of the citizen parent is fixed. Under the code the citizen parent must have resided in the United States preceding the child's birth for at least 10 years, 5 years of which must have been reaching the age of 16 years. This restriction would prevent the perpetuation of United States citizenship by citizens born abroad who remain there, or who may have been born in the United States but who go abroad as infants and do not return to this country. Neither such persons nor their foreign-born children would have a real American background, or any interest except that of being protected by the United States Government while in foreign countries.

S.Rep. No. 76–2150, at 4 (1940). It thus appears that Congress intended the residence requirement enacted in 1940 to restrict the transmission of citizenship by citizen parents living abroad to those parents with "a real American background," acquired through extended residence in the United States, that would be conveyed to their foreign-born children. Such intent would weigh against extending the one-year presence requirement for unmarried citizen mothers under the 1952 Act, which was itself more restrictive than its predecessor in the 1940 Act and could allow further transmission of citizenship by persons "who may have been born in the United States but who go abroad as infants and do not return to this country."

Several considerations temper the weight of this expressed intent. First, it was expressed by the 76th Congress in relation to the provisions of the 1940 Act, and thus can only indirectly inform what the 82nd Congress intended 12 years later when enacting the 1952 legislation. While the residency requirements of the two statutes are largely similar, the 1952 Act also made significant changes, including removing the condition that an alien father fail to legitimate a nonmarital child born abroad before transmitting the mother's U.S. citizenship to the child; lowering the age after which five of the ten years of presence must have occurred from 16 to 14; and increasing a citizen mother's residency requirement from any duration to one year of continuous presence. Nationality Act of 1940, § 201(g), 54 Stat. at 1139; Immigration and Nationality Act of 1952, § 309(c), 66 Stat. at 238–39. While the last of these changes was more restrictive than the 1940 statute, the first two made it easier for both unmarried fathers and unmarried mothers to transmit their citizenship to their foreign-born children. Because the legislative history of the 1952 Act provides no insight into the reasons for these changes or the physical presence requirements more generally, Congress's intent in enacting them in 1952 remains less than certain.

Second, the Court is mindful of the greater context in which the 1952 Act was passed. As discussed above, there is a strong argument to be made that the physical presence requirements were motivated, at least in part, by a desire to "ensure the integrity of the racial bars and national origins quotas" that existed prior to, and were carried forward by, the 1940 Act. Collins, 123 Yale L.J. 2191–96, 2206. As of 1950, U.S. immigration law barred all immigration from a geographical zone that included "parts of China, all of India, Burma, Siam, the Malay States, a part of Russia, part of Arabia, part of Afghanistan, most of the Polynesian Islands, and the East Indian Islands." S.Rep. No. 81–1515, at 368 (1950). Other provisions declared certain peoples to be "racially ineligible for admission: Burmese, Japanese, Koreans, Malayans, Maoris ... natives of New Zealand, Polynesians, natives of Tahiti, and Samoans." Id. at 369. Chinese immigration was prohibited from 1882 until 1943, when Congress added China to the race-based national quota system. Id. The 1952 Act, which repealed provisions related to the barred zone and racial ineligibility, still retained the racially restrictive quota system. Immigration and Nationality Act of 1952, §§ 201–207, 66 Stat. at 175–81; see also Presidential Veto Message, H.R. Doc. No. 82–520, at 2–5 (1952); S.Rep. No. 81–1515, at 455 (1951).

Congress's intent with regard to the physical presence requirements must be viewed in light of this overall statutory scheme. As noted above, the ten-year residency requirement in the 1940 Act was explained by a State Department official in testimony before Congress as an improvement over the 1934 law because "[i]t does not result in spreading citizenship over the face of the earth quite so much ... among aliens." To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigration and Naturalization, 76th Cong. 40 (1945). The official noted that as the law then existed, a U.S. citizen of Chinese or Mexican descent could "marr[y] a Chinese in China or a Mexican in Mexico, as the case may be, and they [could] have children" who "are born citizens of the United States." Id. at 40–41. Congressman Poage echoed the concern, noting that an American citizen "in my State could not marry a Chinese, but an American citizen can go abroad and marry a Chinese and bring her and all her children back to the United States and make them citizens." Id. at 42. Professor Collins has identified an abundance of further examples, outside of the specific context of physical presence requirements, in which lawmakers voiced concerns that allowing a citizen mother to transmit her citizenship to children born abroad would result in extending citizenship to racially ineligible aliens. See Collins, 123 Yale L.J. at 2192–96 & n. 237.

A law intended to restrict the ability of citizens to transmit their citizenship to their children on the basis of their race, even if facially race-neutral, raises serious equal protection concerns. See Hunter v. Underwood, 471 U.S. 222, 232, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Here, the history of the residence requirements for transmission of citizenship by a citizen parent to a foreign-born child, viewed in the context of the racially exclusionary statutory scheme of immigration of which those requirements were a part, strongly suggest that such restriction was at least one purpose of the ten-year physical presence requirement enacted in 1940 and carried forward in the 1952 Act. Even if the 82nd Congress indeed intended that ten years of physical presence be the rule, rather than the exception, for citizen parents of foreign-born children, the Court hesitates to fashion an equal protection remedy based on a law that may itself violate equal protection.

Finally, assuming that Congress's intent was simply to ensure a sufficient connection between the citizen parent and the United States so that the parent would be able to pass on American values to a foreign-born child, the Court is not persuaded that extending the one-year continuous presence requirement to unmarried citizen fathers would prove inconsistent with that intent. Here, Villegas, Jr. has lived in the United States nearly his entire life, with the exception of five years during his childhood. He was unable to transmit his citizenship to Petitioner not because he had not spent enough time in the United States prior to Petitioner's birth, but because Petitioner was born before Villegas, Jr. turned 19. The citizen parents involved in court challenges to various aspects of the requirements for transmission of citizenship to foreign-born children have exhibited similarly strong ties to this country. *See, e.g.,* Brief for Petitioner at 4, *Nguyen,* 208 F.3d at 57, 2000 WL 1899050 (No. 99–2071) (petitioner's father had lived in the United States continuously through early adulthood and brought petitioner to live in the United States when petitioner was six years old); *Miller v. Albright,* 523 U.S. 420, 425, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (petitioner's father was a member of the U.S. military who conceived petitioner while on a tour of duty); Brief for Petitioner at 2–3, *Flores–Villar,* 131 S.Ct. 2312, 2010 WL 2513316 (No. 09–5801) (petitioner's father had resided in the United States for 10 years prior to petitioner's birth and raised petitioner in the United States, but was only 16 when petitioner was born); *Morales–Santana,* 792 F.3d at 258–59 (petitioner's father was born and grew up in Puerto Rico, but left for the Dominican Republic 20 days prior to his 19th birthday); *Cervantes–Nava,* 281 F.3d at 502 (petitioner's mother was born and grew up in the United States, moved to Mexico at age 11, and returned to work in the United States at age 19); Brief for Petitioner at 5, *Willkomm v. Holder,* 341 Fed.Appx. 281 (9th Cir.2009) (unpublished) (No. 06–75631) (petitioner's father served in the Navy for 29 years and conceived petitioner while on active duty); *O'Donovan–Conlin v. U.S. Dep't of State,* 255 F.Supp.2d 1075, 1077–78 (N.D.Cal.2003) (citizen father had lived in Arizona for his entire life except for periods of work abroad totaling of four years). It thus does not appear to the Court that extending the one-year continuous presence requirement to unmarried citizen fathers of children born abroad would necessarily result in transmission of citizenship by fathers "with no real American background, or any interest except that of being protected by the United States Government while in foreign countries."

In light of these considerations, the Court finds that extension of the one-year continuous presence requirement to unmarried citizen fathers is the appropriate remedy for the equal protection violation here. *See Morales–Santana,* 792 F.3d at 270–73; *Heckler,* 465 U.S. at 739 n. 5, 104 S.Ct. 1387 (noting that "ordinarily, extension, rather than nullification, is the proper course").[16] Importantly, this reme-

---

16. The Court notes its conclusion regarding the proper remedy is consistent with the Fifth Circuit's decision in *United States v. Cervantes–Nava,* 281 F.3d 501 (5th Cir.2002). In that case, a criminal defendant challenged his conviction for illegal reentry on the basis that he was a citizen, arguing that the different physical presence requirements for the transmission of citizenship by married and unmar-

ried mothers violated equal protection. *Id.* at 503. The Fifth Circuit assumed *arguendo* that the statute was unconstitutional and analyzed whether the defendant would be entitled to relief under the appropriate equal protection remedy.

The court found that severing the more stringent requirement of INA § 301(a)(7) would not eliminate the (assumed) unconsti-

dy does not amount to a grant of citizenship. Under the Court's analysis of the constitutionality of § 1409(a) and (c), Petitioner has always been a United States citizen. His claim is not that of "an alien who seeks political rights as a member of this Nation," which may be obtained "only upon terms and conditions specified by Congress." *INS v. Pangilinan*, 486 U.S. 875, 884, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988) (quoting *United States v. Ginsberg*, 243 U.S. 472, 474, 37 S.Ct. 422, 61 L.Ed. 853 (1917)). Petitioner instead claims that he is a citizen as of his birth. *See Nguyen*, 533 U.S. at 95–96, 121 S.Ct. 2053 (O'Connor, J., dissenting) ("Petitioners ... seek severance of the offending provisions so that the statute, free of its constitutional defect, can operate to determine whether citizenship was transmitted at birth."). The Court's judgment in his favor "confirm[s] [his] pre-existing citizenship"; it does not "grant [him] rights that [he] does not now possess." *Miller*, 523 U.S. at 432, 118 S.Ct. 1428 (opinion of Stevens, J.). Absent the impermissible gender-based discrimination between unmarried citizen parents at issue here, Petitioner was a citizen as of his birth.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss, **DECLARES** that the different physical presence requirements imposed on unmarried citizen mothers and unmarried citizen fathers for transmission of citizenship to foreign-born children by 8 U.S.C. § 1409, as the statute applied at the time of Petitioner's birth, violates the Constitution's guarantee of equal protection under the Fifth Amendment, and **GRANTS** Petitioner's Petition for Writ of Habeas Corpus.

**IT IS SO ORDERED.**

---

tutional distinction between legitimate and illegitimate mothers because § 309(c) specifically benefits the mothers of children born "out of wedlock." *Id.* at 505. To extend the shorter residency requirement to married mothers, the court would have had to "rewrite § 309(c)." *Id.* The court thus found that severing § 309(c) would be the appropriate remedy to cure the equal protection defect. *Id.* at 506.

Here, the Court need not "engage in legislative draftsmanship." *Id.* The unconstitutional distinction here is between unmarried citizen fathers and unmarried citizen mothers, and extension of § 1409(c) to unmarried citizen fathers is not inconsistent with the "out of wedlock" language used § 1409. It is enough to sever the ten-year requirement of § 1401(a)(7) incorporated by § 1409(a) and replace the term "mother" in § 1409(c) with its gender-neutral equivalent. This remedy is within this Court's remedial power. *See Califano*, 443 U.S. at 92, 99 S.Ct. 2655.